[Crim. No. 19961. First Dist., Div. Two. Mar. 25, 1981.]

**THE PEOPLE, Plaintiff and Respondent, v.
DANIEL JAMES WHITE, Defendant and Appellant.**

272

COUNSEL

Douglas R. Schmidt and Winslow & Schmidt for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein and J. Patrick Collins, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ROUSE, Acting P. J.**—Defendant, Daniel James White, appeals from a judgment and sentence imposed following his conviction by a jury of two counts of voluntary manslaughter, in violation of section 192, subdivision 1, of the Penal Code;[1] also, he was found to have been armed

---

[1]Unless otherwise specified, all statutory references are to the Penal Code, as operative on November 27, 1978, the date on which the offenses were committed.

with and used a firearm in the commission of both offenses, in violation of sections 12022, subdivision (a), and 12022.5.

On November 10, 1978, defendant resigned from his position as a supervisor for the City and County of San Francisco. Several days later, he asked to be reinstated. Mayor George Moscone was responsible for filling the vacancies on the board. Initially, he assured defendant he would be reappointed. Later, the mayor wrote defendant, informing him that he had made no commitment of any kind to reappoint him. Supervisor Harvey Milk opposed defendant's reappointment.

The mayor scheduled a press conference on Monday, November 27, at 11:30 a.m., to announce the new supervisor. On Sunday, November 26, sometime between 10 and 11 p.m., a reporter telephoned defendant and informed him that he was not going to be reinstated. At approximately 10 a.m. on the following morning, defendant telephoned his aide and asked for a ride to city hall. The aide picked up defendant at his home and delivered him to the front entrance to city hall on Polk Street. Instead of entering the building at the regular entrance, where he would be required to pass through a metal detector, defendant went to the McAllister Street side of city hall and entered the building through a basement window. Defendant went up to the mayor's office on the second floor and asked the appointment secretary if he could see the mayor. Defendant was admitted to the mayor's office at 10:40 a.m. After a few minutes, the appointment secretary heard defendant's raised voice in the mayor's office and a series of dull thuds. The mayor's deputy then saw defendant running down the corridor, outside of the mayor's office. The deputy entered the mayor's private sitting room and found the mayor's body. An autopsy revealed that the mayor had been shot four times: twice in the body and twice in the head. The wounds to the head were delivered after the mayor was lying on the floor, incapacitated by the body wounds, and were fired from a distance of one foot from the head. The slugs were from semijacketed .38 caliber bullets.

Shortly before 11 a.m., defendant ran down a corridor from the east side of city hall where the mayor's office is located and used his key to enter a door leading to the supervisors' offices on the west side of the building. Defendant entered Supervisor Harvey Milk's office and, in a normal tone of voice, asked to speak with Supervisor Milk. Defendant and Milk went across the hall to defendant's office. Approximately 15 seconds later, shots were heard in defendant's office. Defendant left his

office and rushed down the corridor. Supervisor Milk's body was found in defendant's office. An autopsy revealed that Supervisor Milk had been shot five times: three times in the body and twice in the back of the head. The head wounds were delivered while Supervisor Milk was on the floor, incapacitated by the body wounds. The slugs were from semijacketed .38 caliber bullets.

Sometime after 11 a.m., defendant ran into his aide's office and yelled to her to give him her car key. After receiving the key, he ran out. Later, defendant called his wife and asked her to meet him at a cathedral. After meeting, they walked together to a police station where defendant surrendered himself to the police. The police removed a .38 caliber Smith and Wesson Chief Special revolver from a holster on defendant's right hip. The shots that killed Mayor Moscone and Supervisor Milk were fired from defendant's gun.

Shortly after his arrest, having been advised of his *Miranda* rights, defendant gave a statement to the police. He stated that he had been under pressure financially, politically, and at home. He had resigned from the board of supervisors to relieve some of the pressure. However, because of family support, he changed his mind and asked to be reappointed. Initially, he was assured by the mayor that he would be reappointed. Later, he discovered that Supervisor Milk was working against his reappointment and that he was being used as a political "scapegoat."

Defendant stated that, since he never heard from the mayor personally, he went to city hall on November 27 to ask the mayor about the reappointment. Before leaving home, he armed himself with a revolver. When he met the mayor and was told that he would not be reappointed, he got "fuzzy" and there was "a roaring in his ears." He thought about the effect his not being reappointed would have on his family and about how the mayor was going to lie to everybody about him not being a good supervisor, so he "just shot him." "[O]ut of instinct" he then reloaded his gun with extra shells from his pocket before leaving the mayor's office. Defendant stated that he then left the mayor's office and saw Supervisor Milk's aide in the corridor. He thought how Supervisor Milk had worked against him and decided he would "go talk to him." When they met, Supervisor Milk "smirked" at him. He "got all flushed" and shot Milk.

At the trial, defendant presented a diminished capacity defense.

It was the opinion of Dr. Jerry Jones, a psychiatrist, that defendant was suffering from severe depression; that he had the capacity to premeditate, to intend to kill, and to know that he should not act in a base and antisocial manner; however, he lacked the capacity to deliberate.

As a result of his examination, Dr. Martin Blinder, a psychiatrist, concluded that defendant was suffering from depression and intense pressure and that the pressure that he was suffering circumvented the mental processes necessary for premeditation, malice and intent.

Dr. George Solmon, a psychiatrist, found that defendant was suffering from recurrent bouts of unipolar depression (i.e., subject to recurrent bouts of depression to a major degree). He concluded that defendant lacked the mental capacity to meaningfully premeditate and deliberate; that he was in a disassociated state of mind and blocked out all awareness of his duty not to kill.

Dr. Donald Lunde, a psychiatrist, concluded that defendant was suffering from severe depression and that on November 27 he did not premeditate or deliberate, nor was he capable of mature, meaningful reflection.

Dr. Richard Delman, a psychologist, performed three psychological tests on defendant and, on the basis of such testing, concluded that defendant's ability to deliberate and premeditate was impaired; that on the day of the shooting he lacked the capacity to weigh considerations and rationally decide on a course of action; also, that defendant lacked the capacity to harbor malice and to appreciate his duty not to do wrong.

In response to such evidence, the district attorney offered testimony of Dr. Roland Levy, a psychiatrist, who, at the time of his examination of defendant on the evening of the shooting, found him to be moderately depressed but lacking any sign of clinical depression. He concluded that defendant had the capacity to deliberate and premeditate. Dr. Levy had reviewed the opinions of the defense psychiatrists and had found nothing to cause him to revise his opinion.

The balance of evidence offered by the defense consisted of testimony by friends, acquaintances and relatives. In substance, that evidence tended to show defendant as a man who enjoyed an honorable reputa-

tion in the community, but a person given to moods of frustration and deep depression. Defendant did not testify.

The jury found defendant guilty of two counts of voluntary manslaughter, a lesser included offense of the crime of murder. The jury also found, as true, charges that, in the commission of the two offenses, defendant was armed with and used a firearm.

The trial judge sentenced defendant to a total term of seven and two-thirds years in state prison. On count one (the killing of Mayor George Moscone), defendant was given the upper term of four years,[2] pursuant to sections 193 and 1170, subdivision (b); also, a two-year firearm use enhancement, pursuant to sections 12022.5 and 1170.1, subdivision (c). On count two (the killing of Supervisor Harvey Milk), defendant was given a consecutive sentence of one year, pursuant to section 1170.1, subdivision (a), and an eight-month firearm use enhancement, pursuant to section 12022.5.[3]

■ In this appeal, defendant contends that the trial court improperly relied upon a single fact, namely, his use of a firearm, as the sole basis for imposing the upper term of imprisonment on count one and imposing firearm use enhancements on both counts one and two. He points out that, under such circumstances, the dual use of a single fact is prohibited. He argues, also, that the reasons given by the trial judge for his sentencing choice are insufficient to justify the imposition of the upper, or aggravated, term of imprisonment under the prescribed sentencing rules. (Cal. Rules of Court, rule 421.) Finally, he claims that the trial judge failed to consider certain mitigating circumstances when selecting the upper term for count one.

In his response, the Attorney General asserts that defendant has no right to complain of this alleged error on appeal because he failed to bring it to the trial court's attention at the sentencing hearing. He argues that defendant's silence in the trial court deprived the court and the prosecutor of the opportunity to cure the alleged sentencing defect and to specify reasons other than the use of a firearm for the imposition

---

[2]The law in effect at the time of the commission of these crimes provided for a maximum term of four years. In 1978, the law was amended to provide for a maximum term of six years' imprisonment for crimes committed on or after January 1, 1979. (Stats. 1978, ch. 579, §§ 3, 48, pp. 1981, 1998.)

[3]Firearm enhancements imposed on both counts, pursuant to section 12022, subdivision (a), were ordered stayed by the trial court.

of the upper term on count one. He has cited no authority in support of his contention that such a sentencing error may be waived.

In reply to the Attorney General's assertion, defendant has directed our attention to *People* v. *Ramos* (1980) 106 Cal.App.3d 591, 598, footnote 1 [165 Cal.Rptr. 179], where a similar waiver argument was rejected. The *Ramos* court stated that it was aware of no authority that waiver principles applied to a sentencing hearing. The court was also of the opinion that, insofar as the defendant's sentencing arguments resembled a challenge to the sufficiency of the evidence and questioned "the validity of certain aggravating factors," such arguments could not be barred on appeal by any waiver theory. (P. 598, fn. 1.)

Here, the trial judge stated reasons for his sentencing choice, but defendant argues that those reasons were inadequate. Thus, the situation is similar to that which existed in *People* v. *Ramos, supra.* For that reason, we will apply the *Ramos* holding, in this instance, and direct our attention to the merits of defendant's appeal.[4]

The record reveals that the probation report listed three circumstances in aggravation and three circumstances in mitigation. The aggravating circumstances included (1) the crime involved great violence and great bodily harm; (2) defendant was armed with and used a weapon; and (3) the crime involved multiple victims. The circumstances in mitigation included (1) defendant had no prior record; (2) defendant was suffering from a mental or physical condition that significantly reduced his culpability for the crime; and (3) defendant voluntarily acknowledged wrongdoing prior to arrest.

At the sentencing hearing, the trial judge gave the following reasons for his choice of the upper term of imprisonment for count one: he stated that he considered that the crimes involved were of "maximum violence" and involved two deaths; also, he expressed the opinion that an upper term of four years for the crime of voluntary manslaughter was an inadequate punishment for that offense. The judge further stated that an additional reason for imposing an upper term was furnished by defendant's expert witnesses who had stated that, in the event of an

---

[4]As a matter of principle, however, we do not totally reject the Attorney General's waiver argument. Certainly, we should seriously question the merits of any appeal which challenges a trial court's sentencing choice where the record indicates that defense counsel remained silent at the time of sentence and failed to call the judge's attention to any perceived infringement of his client's rights.

early release from prison, defendant might be a danger to himself. The judge believed that, since defendant was a member of society, the aggravated sentence would serve to protect him, and thus society. The judge then gave his reasons for imposing consecutive sentences on counts one and two, stating that there were two separate crimes, two separate acts, and two separate victims.

■ Defendant's contention that the trial court failed to consider the circumstances in mitigation is without merit. A trial court is not required to indicate its reasons for rejecting a mitigating factor. (*People v. Davis* (1980) 103 Cal.App.3d 270, 281 [163 Cal.Rptr. 22].) It is also the rule that, unless the record affirmatively reflects otherwise, the trial court will be deemed to have considered the relevant criteria, such as mitigating circumstances, enumerated in the sentencing rules. (*People v. Jackson* (1980) 103 Cal.App.3d 635, 639 [163 Cal.Rptr. 115].) Hence, on the record before us, it must be presumed that the trial court did consider the mitigating circumstances listed in the probation report, but concluded that they were outweighed by the other facts which the trial court relied upon in selecting the upper term of imprisonment.

Of course, we must disregard the trial judge's statement that he felt that an upper term of four years was too light a punishment for the crime of voluntary manslaughter since, as he pointed out, "that was the decision of the Legislature."[5]

The remaining reasons which the trial judge gave for the imposition of the upper term consisted of the "maximum violence" involved in the commission of the crime, the fact that defendant was responsible for two deaths, and the fact that defendant might be a danger to himself if he obtained an early release from prison.

■ The fact that defendant might be a danger to himself if he were released from prison in a relatively short period of time furnishes no valid basis for the imposition of the upper term of imprisonment. ■ Neither does the fact that defendant was responsible for two

---

[5]As previously noted (see fn. 3, *ante*), the maximum term was increased to six years for voluntary manslaughter committed on or after January 1, 1979; however, under the Indeterminate Sentence Law, which prevailed until the Legislature replaced it with the present Determinate Sentencing Act in 1976 (Pen. Code, §§ 1170, 193, subd. (a)), defendant could have been sentenced to a maximum term of fifteen years' imprisonment on each count. Computing a defendant's term under present law is a mathematician's dream but a trial judge's nightmare.

deaths. (*People* v. *Lawson* (1980) 107 Cal.App.3d 748 [165 Cal.Rptr. 764]; Cal. Rules of Court, rule 421.).

■ The Attorney General suggests that the trial court's reference to maximum violence could well have been intended as an allusion to the callous and vicious manner in which defendant used his gun, i.e., that defendant shot George Moscone four times, and that the final two shots were to the victim's head and were fired at extremely close range, under circumstances which suggested that the victim was already on the floor, incapacitated.

Defendant points out that most killings which are accomplished by the use of a firearm involve maximum violence. He claims, therefore, that such a broad characterization of the conduct involved in this case does not provide sufficient reason for selecting the upper, in preference to the middle or lower, term of imprisonment as a sentencing choice.

We agree that the vagueness of such terminology, in this instance, makes it somewhat difficult for us to determine the trial judge's reasoning. However, since the record amply supports the sentences imposed by the trial court, it is not reasonably probable that a remand for resentencing would produce a different result. Thus the error, if any, is harmless. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]; *People* v. *Dozier* (1979) 90 Cal.App.3d 174, 179 [153 Cal.Rptr. 53].)

It could be argued that the evidence in this case would have fully supported a conviction for the crimes of murder of the first degree. However, we must assume that the jury accepted the defense evidence regarding defendant's state of mind at the time of the killings and, on that basis, found him guilty of the lesser crimes of voluntary manslaughter. Although he expressed dissatisfaction with the somewhat minimal term of imprisonment fixed by the Legislature for such a serious crime, the trial judge, nevertheless, was bound to impose a sentence within the limits prescribed by law; but there was no restriction on his right, and obligation, to consider the circumstances surrounding the execution-style killing of each of the victims in setting the terms of imprisonment.

■ Factors warranting the imposition of the aggravated term of imprisonment for each of the crimes committed were present. Those include:

(1) The firing of four shots into the body of the first victim (Moscone), two of which were administered to the head from a distance of *one foot*, in the manner of a coup de grace, while the victim lay helpless on the floor. Such conduct clearly meets the criteria set forth in California Rules of Court, rule 421(a)(1), (3).[6]

(2) The firing of five shots into the body of the second victim (Milk), two of those shots fired into the back of the head, again, delivered in the manner of a coup de grace and after the victim was lying on the floor, incapacitated from the first three rounds.[7] Obviously, each victim was, under such circumstances, "particularly vulnerable" within the meaning of rule 421(a)(3).

(3) The planning with which the crimes were carried out, indicating premeditation, prior to the actual events, this within the contemplation of rule 421(a)(8).[8]

(4) The fact that defendant took advantage of a position of trust or confidence to commit the crimes, i.e., his position as a former supervisor and his relationship, in that capacity, to Supervisor Milk and Mayor Moscone. (Rule 421(a)(12).)

Rule 410 of those same Rules of Court provides that the general objectives of sentencing include, among others, protecting society and punishing the defendant. That rule also directs the sentencing judge to be guided by statutory statements of policy, criteria in the rules, and the facts and circumstances of the case. As has been pointed out, the facts and circumstances of this case virtually mandate the imposition of the maximum penalty allowed by law.

---

[6]Rule 421 provides, in pertinent part, as follows: "Circumstances in aggravation include: [¶] (a) Facts relating to the crime, including the fact that: [¶] (1) The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness, whether or not charged or chargeable as an enhancement under section 12022.7. [¶] ... (3) The victim was particularly vulnerable."

[7]A recent case, *People* v. *Lawson* (1980) 107 Cal.App.3d 748, 752 [165 Cal.Rptr. 764], points out that the sentencing judge may not use the same facts as a basis for imposing both an aggravated and a consecutive term of imprisonment. In this case, it *matters little, since the factors involved in the killing of Mayor Moscone* warrant the imposition of an aggravated term for that crime, whereas those involved in the killing of Supervisor Milk support the imposition of a consecutive sentence.

[8]There was evidence that defendant had the capacity to premeditate.

Defendant also contends that the trial court erred in imposing gun use enhancements, pursuant to section 12022.5, on the sentences imposed on both count one and count two. He argues that the two killings were part of one indivisible transaction having but a single objective, and that, under the reasoning of *In re Culbreth* (1976) 17 Cal.3d 330, 333-335 [130 Cal.Rptr. 719, 551 P.2d 23], only one gun use enhancement was proper.

*Culbreth* involved a situation where the defendant shot and killed three relatives "in a matter of seconds, all part of a single melee." (P. 335.) The *Culbreth* court characterized the killing as "a single frenetic act of violence which, unfortunately, resulted in multiple victims." (P. 334.)

In the recent case of *People v. Blessing* (1979) 94 Cal.App.3d 835 [155 Cal.Rptr. 780], the defendant, who was driving a stolen car, attempted to avoid a traffic jam by executing an illegal driving maneuver. When a police officer approached the defendant to issue a traffic citation, the defendant shot the officer and fled on foot. Within minutes thereafter, the defendant flagged down another car, compelled the driver to exit the car at gunpoint, and then drove the car from the scene. (Pp. 839-840.) As a result of this course of conduct, the defendant was convicted and sentenced for assault with a deadly weapon upon a police officer and robbery, and both sentences were enhanced for firearm use pursuant to section 12022.5. On appeal, the defendant contended that under the *Culbreth* reasoning, only one such enhancement was proper. The appellate court concluded that, while it might well be true that the defendant's fundamental intent or objective was to avoid detection and arrest for stealing the car he was driving and for other offenses which he had recently committed, this fact did not prohibit firearm use enhancements for both sentences. (P. 840.) The court reasoned that to accept such a broad, overriding intent and objective as precluding punishment for what would otherwise be clearly separate offenses would defeat the purpose of section 654, which requires that a defendant's punishment be commensurate with his culpability, and would reward the defendant who had the greater criminal ambition with a lesser punishment. (P. 841.)

The *Blessing* reasoning is controlling here. It is unfortunately true that defendant possessed a similar motive for killing both victims, apparently motivated by a desire for revenge because of his belief that each had opposed his reappointment to the board of supervisors. How-

ever, the fact remains that his desire for vengeance had two separate and distinct individuals as its object and that it was necessary for him to reload his gun after the first killing and travel from the east side of city hall to the west side of that building before locating and killing his second victim. Under these circumstances, we cannot accept defendant's arguments that the two killings were part of one indivisible transaction for which only one gun use enhancement could be imposed.

Finally, defendant claims that he is entitled to good time/work time credit for time spent in presentence custody. In *People* v. *Sage* (1980) 26 Cal.3d 498 [165 Cal.Rptr. 280, 611 P.2d 874], the California Supreme Court ruled that a defendant is entitled to conduct credits for credits earned during the period he was detained in the county jail prior to his commitment to prison. Accordingly the Department of Corrections is directed to compute any conduct credits administratively.

The judgment is affirmed.

Miller, J., and Smith, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 21, 1981.