[Crim. No. 43128. Second Dist., Div. Four. May 29, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
MAURICE LEVITT, Defendant and Appellant.

**COUNSEL**

Dennis A. Fischer and Fischer & Hill for Defendant and Appellant.

John K. Van de Kamp, Attorney General, John R. Gorey and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KINGSLEY, J.**—Defendant, charged with the murders of George Lusko (count I) and Robert Richards (count II), was tried by jury and convicted of two counts of voluntary manslaughter. (Pen. Code, § 192, subd. 1.) The jury sustained firearm-use allegations in each count. (Pen. Code, § 12022.5.) Defendant was sentenced to state prison for the upper term in count II and a consecutive term for count I. Additional consecutive terms were imposed for the two use enhancements. On this appeal from the judgment of conviction, we modify the sentence and otherwise affirm.

Defendant and Lusko were business partners, sharing a suite of offices in Torrance. Defendant's wife, Grace, worked in the business and had daily contact with Lusko, while defendant largely occupied his working days elsewhere in connection with his other, independent, business interests. Defendant, Lusko and Grace socialized together as a threesome.

In March 1981, Grace left defendant, without warning and without telling him where she was going, and moved into a condominium rented for her by Lusko. At the time, Grace was considering divorcing defendant and accepting Lusko's proposal of marriage.

Subsequently, defendant called the Torrance suite several times, attempting to locate Grace; pursuant to Grace's instructions, he was falsely told that she had stopped coming into work and that no one knew where she was. Defendant also hired a private detective to follow Lusko, but Lusko appeared to notice that he was being tailed, and failed to lead the detective to Grace.

On April 26, defendant bought a gun under a false name. The next day he went to the door of the Torrance suite, parking his car somewhere other than in the suite lot, but did not go in. The day after, on April 28, he again went to the suite and again parked his car elsewhere. This time he entered. According to prosecution witnesses, a brief series of shots was heard along with a woman's screams, within seconds after defendant's entry. A short time later, defendant approached two employees and asked them where Grace was; he pointed a gun, while pulling the trigger, at each of them, but the gun clicked without firing.

Defendant drove away, stopping to throw the gun in a trash can, and eventually arrived at a hospital, where he was examined and admitted. He was found to be dazed and confused, suffering from acute high blood pressure, and displaying a bruise on his head. Police arrested him at the hospital.

The shots that defendant had fired in the suite killed Lusko and Robert Richards, a customer of Lusko's who had entered the suite to pick up a receipt just before he was shot. The bodies lay in adjoining offices, Richards' with a gunshot wound in the back of his head fired from a distance of 20 inches or more, and Lusko's with two gunshot wounds in the body (one a defensive-type wound), a third to the back of the head and a fourth in the right ear. The latter two wounds were both mortal and both inflicted from a distance of one to two inches.

The only eyewitnesses to the killings were defendant, and Grace, who testified on his behalf. According to Grace, she greeted defendant when he entered her office, but became frightened and screamed for Lusko when defendant approached her; Lusko then ran in, followed by Richards. Grace heard shots and ran away. This testimony was somewhat contrary to what Grace had told the police on the day of the killings. At that time, she had stated that she witnessed no confrontation and had not seen defendant at all; rather, she only heard some shots and saw a bloodied Lusko running while she was coming out of the bathroom.

Defendant testified that when Grace screamed for Lusko, Lusko and Richards ran up and attacked him, Richards hitting him with fists and Lusko with a club, while telling him he was about to die. Defendant hit back at

both men, then shot at Lusko and next at Richards, after which Richards was "out of the picture." The fight with Lusko continued until defendant, in a dazed state, shot at him several more times.

Regarding the events leading up to the killings, defendant testified that he suspected Lusko not only of knowing where Grace was (though not of any romantic involvement with her), but also of stealing from the partnership. When defendant told Lusko of the latter suspicion, Lusko threatened to "sic" a hired killer on him. Defendant took the threat seriously, but nonetheless made an April 28 appointment to see Lusko because of pressing business matters. He bought the gun to protect himself in the event Lusko used the appointment as an opportunity to have him killed, and went to the suite a day early in order to avoid a possible ambush. Since Lusko was not there on the 27th, defendant returned on the 28th.

Defendant denied pulling the trigger on the two employees he approached after the killings. He had no explanation for why he had given a false name when buying the gun, other than that he did not want anyone to know of the purchase.

I

The jury was instructed that a defendant who kills in self-defense is guilty of no crime and that a defendant who kills out of the honest but unreasonable belief in the necessity to act in self-defense is guilty only of manslaughter. (See *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1].) Defendant requested that the jury also be instructed on how the doctrine of "transferred intent" applies to each of these defenses. His proposed instructions stated that (1) if defendant killed Richards inadvertently while exercising self-defense as to Lusko, then he should be acquitted of the Richards homicide; and (2) if he killed Richards inadvertently while exercising an honest but unreasonable belief in the necessity to act in self-defense as to Lusko, then he could be found guilty of manslaughter for the Richards homicide. Defendant now contends that the trial court erred in refusing these instructions.

■ We agree that the doctrine of transferred intent is available as a defense in California. Under this doctrine, just as "one's criminal intent follows the corresponding criminal act to its unintended consequences," so too one's *lack* of criminal intent follows the corresponding *non*-criminal act to its unintended consequences. (*People* v. *Mathews* (1979) 91 Cal.App.3d 1018, 1023 [154 Cal.Rptr. 628].) Thus, a defendant is guilty of no crime if his legitimate act in self-defense results in the inadvertent death of an innocent bystander. (*Ibid.*) We also agree that instructions on transferred

intent, just as instructions on any other defense, must be given on request if there is substantial evidence to support them. (*People* v. *Mathews, supra; People* v. *Flannel, supra,* 25 Cal.3d 668.)

■ Here, however, there was no substantial evidence to support a theory of transferred intent as to the Richards homicide, because the evidence showed that Richards' death could not have been the inadvertent result of defendant's attempt to defend himself from Lusko. Defendant testified that he first took a "potshot" at Lusko in office number 3, Richards subsequently circled around him, he then shot "at" Richards after which Richards was "out of the picture," and that no more shots were fired until his struggle with Lusko moved into office number 4. The coroner testified that the shot which killed Richards resulted in instantaneous death; Richards' body was found in office number 3, and Lusko's in number 4. This evidence shows that the only shot which could have killed Richards was the one defendant fired "at" him. Had Richards been hit by the initial "potshot," he would not have been alive to subsequently circle around defendant; had he been hit by any of the shots fired in number 4, he would not have been alive to move back to number 3, nor would he have been "out of the picture" before these shots were fired. As such, the evidence is irreconcilable with the theory that Richards was inadvertently felled by a shot meant for Lusko.

■ We realize that, in the face of substantial evidence to support a requested instruction, such request cannot be denied merely on the basis that some portion of the defendant's testimony is inconsistent with the state of facts contemplated by the instruction; a jury is entitled to accept some parts of the defendant's testimony while rejecting others. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 328 [185 Cal.Rptr. 436, 650 P.2d 311].)
■ Here, however, the *whole* of defendant's testimony, corroborated by the coroner's evidence and position of the bodies, was inconsistent with the inadvertence theory. Under these circumstances, the court did not err in refusing the instructions.

Moreover, defendant cannot have been prejudiced by the lack of instruction on transferred intent. The jury found that defendant's intent as to the killing of Lusko rendered him guilty of manslaughter. As we have seen, "one's criminal intent follows the corresponding criminal act to its unintended consequences." (*Mathews, supra,* 91 Cal.App.3d at p. 1023.) Thus, even if the jury had been given the opportunity to find that Richards' death was the unintended consequence of an act directed at Lusko, the intent which followed that act would have rendered defendant guilty of manslaughter for the Richards homicide since manslaughter was his intent as to Lus-

ko.[1] Since manslaughter of Richards was precisely the verdict defendant received, he has no cause to complain.

## II

Defendant next contends that there was insufficient evidence of manslaughter in that the record establishes complete self-defense as a matter of law. We disagree.

"[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may not be justified then the issue is a question of fact for the jury to determine. [Citation.] Where the evidence is uncontroverted, but reasonable persons could differ on whether the resort to force was justified or whether the force resorted to was excessive, then the issue is a question of fact for the trier of fact. [Citations.]" (*People* v. *Clark* (1982) 130 Cal.App.3d 371, 379 [181 Cal.Rptr. 682].)

Here, assuming—as defendant does—that we must accept the jury's implied finding that defendant was justified in using *some* degree of force, reasonable persons could certainly differ on whether the force resorted to was excessive. Both victims were shot in the back of the head and at least one of Lusko's wounds was administered while he was incapacitated and dying if not already dead. Lusko may have been armed with a club, but Richards was weaponless. Defendant's subsequent action in pulling the trigger on two employees was highly probative of a willingness to attempt unjustified violence.

Moreover, if the degree of force used was influenced by any motivations aside from a belief in the necessity to act in self-defense, then manslaughter was an appropriate verdict on that ground alone. In order for homicide to be completely justified in self-defense, "the circumstances must be sufficient to excite the fears of a reasonable person, *and the party killing must have acted under the influence of such fears alone.*" (Pen. Code, § 198, italics added; see also, *People* v. *Flannel, supra,* 25 Cal.3d at p. 675.) Here, in light of the evidence of a rather classic motive and of defendant's clandes-

---

[1]Defendant also makes the contention that, under the transferred intent doctrine, the jury could properly have *acquitted* him of the Richards' homicide notwithstanding a finding that defendant's intent as to Lusko was manslaughter. This is directly contrary to our understanding of the doctrine. Per *Mathews,* a defendant's criminal intent towards his intended victim controls his culpability for any unintended result. Thus, defendant could properly have been acquitted of the Richards killing under the transferred intent doctrine only if the jury had found that he had no criminal intent *whatsoever* as to Lusko.

tine gun purchase, a reasonable trier could have found that, even assuming defendant had the right to use some force in self-defense, he was less than candid regarding the degree of danger he actually faced, and his response was attributable more to a preconceived intent to kill than to the actual danger.

More fundamentally, we disagree with defendant's basic assumption that, in determining the sufficiency of evidence, we are bound to accept the jury's "implied findings" that defendant was in fact attacked by Lusko and Richards and that he honestly believed himself entitled to use deadly force in response. The manslaughter verdicts *could* have been based on such findings, but they might alternatively have been based on heat of passion/sudden quarrel manslaughter instructions. The jurors could have rejected defendant's account in its entirety as self-serving and as troublesome in light of the evidence, inter alia, that Richards had no apparent motive to attack him and that the fatal shots were fired almost immediately after defendant entered the suite. (See *People* v. *Acosta* (1955) 45 Cal.2d 538, 541-542 [290 P.2d 1]; *People* v. *Salaz* (1924) 66 Cal.App. 173, 181 [225 P.2d 777].) Under the passion and quarrel instructions, the jurors could then have reasoned that, although defendant had not been attacked, a reasonable doubt existed whether Lusko's prior relationship with Grace, possibly exacerbated by Grace's screaming for Lusko's protection when defendant sought only to talk to her, threw defendant into a blind homicidial rage and constituted adequate provocation.

In sum, depending on how the jury interpreted various strands of the evidence, verdicts of manslaughter could have reasonably been returned on several theories of that offense. Moreover, the jury was entitled to reject the testimony of the defense witnesses entirely, and on the basis of the prosecution evidence, convict defendant of two counts of murder. Our task is not so complex as was the jury's; we need only determine whether the record as a whole could support a finding of two intentional killings committed with less than complete justification. The record is more than sufficient in this respect.

### III

■ Defendant argues that under the "single occasion" rule of *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23], he should have been punished for only one of the firearm-use enhancements. We agree.

According to *Culbreth,* the legislative purpose of Penal Code section 12022.5 is to deter the use of firearms on *subsequent occasions*. "Thus it

has been held that where there are consecutive robberies in several communities over a period of several hours, a defendant may not bootstrap himself into avoidance of additional penalties by claiming that the series of divisible acts, each of which had been committed with a separate identifiable intent and objective, composed an indivisible transaction. [Citations.] But if all the charged offenses are incident to one objective and effectively comprise an indivisible transaction, then section 12022.5 may be invoked only once and not in accordance with the number of victims. [Citation.]'' (17 Cal.3d at pp. 333-334.)

*Culbreth* approved the following statement of the "single occasion" rule: ". . . [T]he statute envisions a single application of deterrent force for each occasion, hopefully to deter gun use on a future occasion. Where . . . a single judgment imposes sentences for several crimes committed on a single occasion, only one finding under section 12022.5 is permissible." (*Culbreth, supra,* at p. 335, quoting *People* v. *Johnson* (1974) 38 Cal.App.3d 1, 12 [112 Cal.Rptr. 834].)

These formulations are vague as to what constitutes a "single occasion." It appears clear that the gun uses must occur during a continuous period of *time,* i.e., in the course of a continuous transaction in which the defendant has no "time out" from his series of crimes to pause and reflect on the penal consequences of each successive use. However, the meaning of the requirement that the uses be "incident to one objective" is far less clear. We conclude that the "incident to one objective" language of *Culbreth* means that multiple uses occurring during a continuous transaction are incident to a single objective unless the evidence supports a reasonable inference that the motivations underlying the uses are unrelated to each other. Thus if a defendant uses a firearm to rob several salesclerks in one establishment, he can be punished for only one gun use, because the motivation for each use is related to his overall objective of theft. (*People* v. *Freeman* (1979) 95 Cal.App.3d 917 [157 Cal.Rptr. 454].) And if, during the same transaction, he shoots at a police officer who is attempting to apprehend him, he is still punishable for only one use because the motivation of avoiding capture is related to the objective of accomplishing the crime. (See *People* v. *Chavez* (1980) 26 Cal.3d 334 [161 Cal.Rptr. 762, 605 P.2d 401], discussed *infra.*) However, we conclude that if he shoots one of the salesclerks simply because that clerk happens to be his enemy, then he can be separately punished for that gun use, because it is underlain by the independent motivation of revenge. In the latter case, and only in the latter case, the emergence of an independent motivation, entirely unrelated to the defendant's primary criminal objective, is rationally equivalent for deterrent purposes to a "subsequent occasion," since it gives the defendant an opportunity to pause and reflect on the enhanced penal consequences of using

his gun to achieve a newly-arising objective, and thereby enables Penal Code section 12022.5 to deter the contemplated successive use.

Our conclusion that related motivations constitute but one "objective" for purposes of the single occasion rule is made upon consideration of the facts of *Culbreth* and of a more recent Supreme Court case, *People* v. *Chavez* (1980) 26 Cal.3d 334 [161 Cal.Rptr. 762, 605 P.2d 401].

In *Culbreth,* the court found a single transaction and single objective where the defendant shot three victims in a matter of seconds. The only evidence of intent in that case reasonably indicates that the defendant had a separate identifiable intent to kill *each* of the victims, since two of them had purportedly threatened to kill him and the third had provided a gun to one of the others. In *Chavez,* where the court again applied the single occasion rule, the evidence showed not only that the defendant intended to use a firearm on each of two groups of victims, but also that his motivation as to each group differed. Chavez first shot at members of a rival gang, and next, in a pursuit which immediately followed, at the police officers who were attempting to arrest him. Although such evidence clearly indicates to us that there were two identifiable motivations, one of gang-rivalry and the other of escape from capture, the court found a "single occasion" within the meaning of *Culbreth* on the basis that the two uses constituted one continuous event. The Attorney General conceded the applicability of the single occasion rule to such facts.[2]

Thus the authors of the *Culbreth* rule have found that a "single occasion" exists in cases where the defendant intends to use a gun to achieve a criminal objective during a continuous transaction, even if that intention encompasses decisions to kill more than one victim, and even if it encompasses the use of force to escape from his crime as well as to perpetrate it. With the facts of these cases and the deterrence rationale of section 12022.5 in mind, it seems inescapable that a single occasion exists absent the occurrence of a meaningful separation in time or the emergence of a criminal objective unrelated to the primary criminal enterprise. In the absence of one or the other of these two circumstances, no temporal or mental lacuna exists to enable the deterrent purposes of section 12022.5 to prevent the defendant's subsequent gun use.

It is essential to remember that the single occasion rule prohibits multiplicity of sentences for gun use in situations where it is perfectly proper to impose separate sentences for the crimes *underlying* the uses. (Pen. Code,

---

[2]We note that the court was not at all bound to accept the concession if it disagreed with it.

§ 654; *People* v. *Johnson* (1974) 38 Cal.App.3d 1, 12 [112 Cal.Rptr. 834].) Culbreth and Chavez could have properly received separate sentences for each of their assaults under section 654 since that section allows crimes committed on a multiplicity of victims to be separately punished *regardless* of whether the crimes occurred on a single occasion. Section 12022.5, however, has a more restrictive application. Because its purpose is to deter *subsequent* uses rather than to impose punishment commensurate with a body-count of intentionally assaulted victims, it generally cannot be used to separately enhance sentences for multiple crimes committed during a single occasion in time.

*Culbreth*, of course, sets forth a *two*-prong definition of what constitutes a single occasion; *apart* from the time factor, the crimes must be incident to one objective. By defining the "incident to one objective" language of the rule as we have here, we give effect to both prongs of the rule while still maintaining the underlying deterrence function of section 12022.5.

In the present case, the trial court recognized that the killings of Lusko and Richards were "close in time," but ruled that the single occasion rule need not be applied because defendant had separate motivations for each killing. The court felt that defendant killed Lusko because Lusko was interfering with his marriage and perhaps his business "and perhaps he had some idea of harm coming from Mr. Lusko," while the killing of Richards was "to silence a potential witness."

This analysis was misplaced. While some of the evidence supported the court's view of defendant's motivations for the killings, the motivations which the court identified were integrally related to one another. For purposes of the single occasion rule, we see no reasoned distinction between evidence showing the use of a gun to avoid apprehension by silencing a witness versus that showing use to avoid apprehension by shooting at pursuing police (*Chavez*). In each case, there is one single objective of carrying out a criminal enterprise, and the motivations of using a gun to effect the enterprise and to successfully escape from it constitute related components of that single objective.

Finally, we agree with the trial court's implied finding that the killings were indivisible in time. The victims were killed within seconds of each other. The witnesses who heard the shots all stated that there was a single brief burst with no more than one or two seconds elapsing between any of the shots. Even assuming (as respondent does, with no explanation) that the lapse of one or two seconds represented the interval between the firing at Lusko and that at Richards, two seconds is clearly insufficient to create a meaningful divisibility in time for purposes of any deterrent effect. Sub-

stantially more than a few seconds elapsed between the gun uses in *Chavez, Miller,* and *Freeman,* all *supra,* all cases in which a single occasion was found. Since the killings here occurred during an indivisible period of time, with no evidence of the emergence of an independent criminal objective during that period of time, defendant could be properly punished for only one of the use enhancements.

The Attorney General relies on *People* v. *Blessing,* (1979) 94 Cal.App.3d 835 [155 Cal.Rptr. 780] and *People* v. *White* (1981) 117 Cal.App.3d 270 [172 Cal.Rptr. 612]. These cases, however, are distinguishable. In both of them the defendants had substantial "time out" to reflect between gun-uses. In *Blessing,* 15 minutes elapsed; in *White,* the defendant had sufficient time to traverse a building, reload his weapon, and seek out his second victim. We also distinguish a recent case, *People* v. *Clay* (1984) 153 Cal.App.3d 433 [200 Cal.Rptr. 269]. There the court found that each time the defendant broke into a different room of a nursing home to rob its occupants, a subsequent occasion arose for which a separate firearm-use enhancement could be imposed. The court reasoned that in between leaving each room and breaking into the next, the defendant had the "opportunity to allow Penal Code section 12022.5 to persuade him to abandon a separate occasion of firearm use." (*Id.,* at p. 464.) No such divisibility of occasion between uses occurred in the instant case.

## IV

In a separate challenge to his sentence, defendant contends that a remand is necessary because the court relied on several improper factors in imposing an upper and consecutive term. We agree that some of the relied-on factors were improper, but find no reasonable probability that defendant would have received a lesser sentence absent the errors.

In imposing the upper term for the killing of Richards, the court cited five factors in aggravation: (1) the victim was vulnerable; (2) the crime was callous and vicious; (3) there was planning, showing premeditation; (4) the killing was almost "execution" style; and (5) the victim left behind a wife and unborn child who could not be recompensed for their loss. A consecutive term was imposed for the Lusko killing on the bases of (1) multiple victims; (2) "completely independent" crimes and objectives; and (3) separate acts of violence. Defendant challenges everyone of these factors. We discuss them in turn.

██ *Vulnerable victim (California Rules of Court, rule 421(a)(3)[3]).* This factor is properly shown if the circumstances surrounding the crime render

---

[3]All rule citations are to the California Rules of Court.

the victim vulnerable "in a special or unusual degree, to an extent greater than in other cases." (*People* v. *Smith* (1979) 94 Cal.App.3d 433, 436 [156 Cal.Rptr. 502]; see also, *People* v. *Eades* (1979) 95 Cal.App.3d 688 [157 Cal.Rptr. 223].) Here, the court could have reasonably concluded that the defense witnesses were lying about defendant having been attacked, and relied on, inter alia, Richards' lack of both a weapon and of an apparent motive to harm defendant, to find that defendant killed him for no other reason than that he was a potential witness to the Lusko killing. The court explicity took this view. (See section III, *ante.*) Under this view, Richards was more vulnerable than the "ordinary" voluntary manslaughter victim because he did nothing to provoke or partially excuse defendant's mortal assault; rather, he was simply in the wrong place at the wrong time and therefore caught unawares. We distinguish *People* v. *Bloom* (1983) 142 Cal.App.3d. 310 [190 Cal.Rptr. 85], where the court found that the fact that the victim happened to be in the wrong place at the wrong time did not make him any more vulnerable than the ordinary *drunk driving* victim. Felony drunk driving *presupposes* an entirely innocent and unsuspecting victim; voluntary manslaughter does not. Moreover, some of the evidence here supported the view not only that Richards was at the wrong place at the wrong time, but also that, unlike the drunk driving situation, defendant took *deliberate advantage* of that fact.

Although this view of the evidence may be contrary to the jury's implied findings of no malice, the trial court was entitled to take such a contrary view. The jury's verdict did not imply a rejection of the evidence of malice; it merely meant that the jury did not feel malice was proven beyond a *reasonable doubt*. The standard governing a sentencing court is far less stringent; the court need only determine whether aggravating factors are established by a *preponderance* of evidence. (*People* v. *Ramos* (1980) 106 Cal.App.3d 591, 602-604 [165 Cal.Rptr. 179]; rule 439(b). Here, there was sufficient evidence under this standard to support the finding of special vulnerability.

■ *Callousness and viciousness, rule 421(a)(7).* Defendant attacks this factor on the ground that it is contrary to the jury's implied findings. We have seen, however, that the court was not bound by such findings since its determination was subject to a lesser standard of proof. Defendant further contends that the court stated this factor so vaguely as to leave open the possibility· that it was relying simply on gun-use or vulnerability, and thus indulging in a proscribed dual-use of facts. (*People* v. *Smith* (1980) 101 Cal.App.3d 964 [161 Cal.Rptr. 787]; *People* v. *Alvarado* (1982) 133 Cal.App.3d 1003 [184 Cal.Rptr. 483]; Pen. Code, § 1170, subd. (b).) Unlike the cited cases, however, there was evidence here to support a finding of callousness and viciousness beyond mere gun-use or vulnerability of the

victim. As in *People* v. *White, supra,* 117 Cal.App.3d 270, 282, we think that the nature of the wound—here, in the *back* of the head—displays a callousness beyond that inherent in a mere gun-use. The court explicitly referred to the location of Richards' wound in the course of imposing the upper term. (See *post.*) We also note that, considering the "coup-de-grâce" wound inflicted on Lusko, the court was justified in its observation that the entire criminal enterprise was characterized by callousness.

*Planning and premeditation, rule 421(a)(8).* This factor, again, was adequately supported by the evidence (defendant's actions prior to the day of the killings) notwithstanding the jury's verdicts of manslaughter. Defendant argues, however, that Richards' killing should not have been aggravated on the basis of premeditation, since all planning and premeditation was directed at the killing of *Lusko.* We think this distinction is irrelevant. There was ample evidence that defendant embarked on his criminal endeavor having planned to use deadly force. We know of no case that holds, in the face of such planning, that premeditation cannot be relied on to aggravate a crime committed as part and parcel of that endeavor. Defendant's planning activity rendered him more culpable than other manslaughterers; that enhanced culpability is hardly mitigated by the fact that he ultimately enlarged his crime beyond his original plans.

*Execution-type slaying.* Defendant contends, and we agree, that reliance on this factor constituted a dual-use of facts. The court had already found that the killings were callous and vicious. That finding could not have properly been based on Richards' special vulnerability, since vulnerability was cited as an independent factor. The only other evidence supporting the finding of callousness and viciousness was the execution style of the wounds. To cite the nature of the wounds as a separate aggravating factor was therefore redundant to the factors previously found.

*Bereavement of the victim's family.* We agree with defendant that this factor could not properly be relied on to aggravate his sentence because it bears no rational relationship to his degree of culpability. Although a sentencing court is not confined to the aggravating factors listed in rule 421, the factors it chooses to rely on must be "reasonably related to the decision being made." (*People* v. *Bloom, supra,* 142 Cal.App.3d 310, 321; rule 408.) The purpose of sentencing is to punish defendants in accordance with their level of culpability. We think it obvious that a defendant's level of culpability depends not on fortuitous circumstances such as the composition of his victim's family, but on circumstances over which he has control. A defendant may choose, or decline, to premeditate, to act callously, to attack a vulnerable victim, to commit a crime while on probation, or to amass a record of offenses. *All* of the factors of rule 421 are based upon such choices

which the defendant makes of his own will. In contrast, the fact that a victim's family is irredeemably bereaved can be attributable to no act of will of the defendant other than his commission of homicide in the first place. Such bereavement is relevant to damages in a civil action, but it has no relationship to the proper purposes of sentencing in a criminal case.

 *Multiple victims, rule 425(a)(4).* Defendant correctly points out that sentences cannot be made consecutive on the basis of multiple victims if, as here, there is but one victim per count. (*People* v. *Humphrey* (1982) 138 Cal.App.3d 881 [188 Cal.Rptr. 473].) We need not address respondent's contention that the evidence of the subsequent assaults on the two employees could support a finding of multiple victims, since the court made no reference to this evidence at sentencing. The court clearly considered Lusko and Richards to be the "multiple victims" in this case. Moreover, although the assaults, assuming they occurred, were transactionally related to the manslaughters, they were not charged and defendant consequently had no notice of any opportunity or necessity to contest them. (Contrast *People* v. *Guevara* (1979) 88 Cal.App.3d 86, 92-94 [151 Cal.Rptr. 511].) We therefore doubt whether the "victims" of uncharged counts can support a multiple-victim finding in any event.

*"Completely independent" crimes and objectives, see rule 425(a)(1).* As we observed in section III, *ante,* we do not believe that the "crimes and their objectives were predominantly independent of each other" (rule 425(a)(1)). Certainly then, the court's finding of *complete* independence was unfounded. Moreover, insofar as the court relied on the supposed differing motivations for the two killings in finding "independence," it was relying on the vulnerable-victim factor used to aggravate the base term; and insofar as it relied on the fact two victims were each subjected to a discrete act of violence, it was relying on the separately stated factor of "separate acts of violence" (see *post.*). Reliance of the first sort is proscribed as a dual-use of facts (*People* v. *Kozel* (1982) 133 Cal.App.3d 507, 540 [184 Cal.Rptr. 208]); that of the second sort is completely redundant.

*Separate acts of violence, rule 425(a)(2).* The record does show, however, that "[t]he crimes involved separate acts of violence or threats of violence" (rule 425(a)(2)), a factor that may be used to make sentences consecutive even if rule 425(a)(1) does not apply. Defendant relies on *People* v. *Alvarado* (1982) 133 Cal.App.3d 1003, 1028 [184 Cal.Rptr. 483], which held that rule 425(a)(2) "looks for separate acts, while the instant facts reveal more or less a single violent action." *Alvarado,* like the present case, concerned assaultive crimes on separate victims during a single transaction. If *Alvarado* is taken to mean—as defendant argues it does—that ho-

micidal assaults on two victims cannot be separately punished on the basis that there was violence to each victim, then we disagree with it. Such an interpretation would equate culpability for one act of killing with culpability for two, and would essentially preclude the sentencing court from imposing any punishment for a second (or third, or fourth) killing unless the crimes were otherwise aggravated or isolated in time. We conclude that the rule 425(a)(2) reference to "separate acts of violence" accords the trial court discretion to impose separate punishment for multiple homicides committed during a single transaction, as long as each homicide is attributable to a separate identifiable act. Here, since the two homicides were attributable to separate acts of firing, the court had discretion to rely on rule 425(a)(2).

 We now turn to the question of prejudice. As we have seen, two of the five aggravating factors, and two of the three factors for imposing consecutive sentences were improperly relied on. If we were to determine prejudice on the basis of simple arithmetic, we would have no doubt that the sentencing errors were prejudicial, even if the mitigating factor of no prior criminal record were not present here.[4] We have previously held that one bad aggravating factor out of three required remand (*People* v. *Jardine* (1981) 116 Cal.App.3d 907, 924 [172 Cal.Rptr. 408]), and we think that, absent unusual circumstances, the presence of a mitigating factor renders improper reliance on an aggravating factor prejudicial, since, with the improper factor eliminated, the presence of mitigation might reasonably affect the balance of the trial court's judgment.

However, the case before us is a highly unusual one, in which the record indicates a virtual certainty that the erroneous factors did not affect the balance of the trial court's judgment, and consequently no reasonable probability that the court would impose a lesser sentence on remand.

It must be remembered that this is a *manslaughter* case in which an execution style killing, premeditation and planning, the intent to eliminate a witness, and separate acts of violence on two victims were *all properly* found. These factors make the case far more aggravated than most manslaughters. Moreover, we have noted (in section II, *ante*) that there was substantial evidence to justify a rational trier in finding the commission of two murders beyond a reasonable doubt. The trial court's comments at sentencing indicate that *it* felt that the evidence as a whole showed the killing

---

[4] The court found this mitigating factor but said that it was "far outweighed" by the aggravating circumstances.

of Richards, and possibly of Lusko as well, to be murder rather than manslaughter, and that it felt, perhaps even more strongly, that defendant's commission of *two* intentional killings made him substantially more culpable than had he committed only one. Under these circumstances, the following conclusions appear inevitable. ██ First, the court was trying to partially "correct for" the jury's verdict in the one way it was entitled to do, by giving defendant the maximum possible term for the lesser crime found by the jury based on substantial evidence that a higher crime was in fact committed; in effect the court relied on evidence of murder to make the sentence more commensurate to that prescribed for murderers[5]. Second, the court was adamantly opposed to the idea that defendant, having chosen to kill two people, should be punished as if he had killed but one.

Under these unusual circumstances, a remand would be futile. There is no reasonable probability that the court would sentence differently, and we accordingly hold that the sentencing errors were nonprejudicial under *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].

## V

We agree with defendant's last contention that the trial court miscalculated the credit he was to receive for presentence confinement. The record reflects entitlement to total credits of 664 days, 443 days for time actually served plus 221 days of conduct credits. (See *In re Allen* (1980) 105 Cal.App.3d 310, 315 [164 Cal.Rptr. 319].) Due to miscalculation the court awarded only 652 days.

## DISPOSITION

The judgment of conviction is modified to provide: (1) that defendant shall serve only one additional period of imprisonment pursuant to section 12022.5; and (2) that he is entitled to 664 days of presentence custody credit. The trial court is directed to prepare an amended abstract of judgment reflecting these modifications and to forward a certified copy of it to

---

[5]Contrary to defendant's interpretation of our recent opinion *People v. Wells* (1983) 149 Cal.App.3d 721, 730 [197 Cal.Rptr. 163], sentencing courts are not foreclosed from relying on substantial evidence that a higher crime was committed in imposing sentence for the lesser crime found by the jury. Such reliance is appropriate *if*, as here, the evidence in question constitutes a factor or factors in aggravation and if the sentencing court treats it as such. The court's vice in *Wells* was to base a sentencing decision on its personal belief that a higher crime was committed, rather than on specific evidence that would support the sentencing decision under the applicable rules and statutes.

the Department of Corrections which is directed to file it. In all other respects, the judgment is affirmed.

Woods, P. J., and McClosky, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 13, 1984.