Filed 2/5/14  P. v. McGinty CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>NANCY JO MCGINTY,<br><br>        Defendant and Appellant. | A135201<br><br>(Mendocino County<br>Super. Ct. No. SCUKCRCR1116558) |

Nancy Jo McGinty (appellant) appeals from a judgment entered after she pleaded no contest to attempted voluntary manslaughter (Pen. Code, §§ 664/192, subd. (a), count one[1]) and arson of a dwelling (§ 451, subd. (b), count two) with the use of an accelerant (§ 451.1, subd. (a)(5)), and the trial court sentenced her to 13 years in state prison.  She contends the trial court erred in: (1) imposing the upper term on count two; and (2) not staying the sentence on count one pursuant to section 654.  We reject the contentions and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

A felony complaint was filed March 1, 2011, charging appellant with attempted murder (§§ 664/187, count one) and arson of a dwelling (§ 451, subd. (b), count two).  The complaint further charged that appellant committed arson with a device designed to accelerate the fire (§ 451.1, subd. (a)(5)).  The complaint was based on an incident that took place on December 14, 2010.  That night, at about 10:20 p.m., Mendocino County

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

1

Sheriff's Office Deputies Elmore and Kendall responded to a residence regarding a suspicious circumstance involving a fire.[2]  When Kendall arrived, he saw that the residence was burned and that most of the roof and walls had come down.

Kendall spoke with Brooktrails Fire Chief Schoeppner, who said he had been summoned to the location following a report of a fire and explosion.  Upon arrival, he noticed the residence was fully engulfed in flames and that the south living room wall had been "basically blown out and laying against a large fir tree" that was holding the separated wall up.  Schoeppner stated that neighbors had saved Michael Faustina—a disabled adult resident—from inside of the house as it was burning.  Kendall knew both Faustina and Faustina's mother, appellant, from prior contacts.  Faustina was a 31-year-old man with a brain injury from a traffic accident.  He was a quadriplegic and could not speak, move, or eat without assistance.

A neighbor who identified himself as "Zac" said that he heard the explosion and saw the house burning.  Zac knew that Faustina was bedridden inside, so he entered with another neighbor in hopes of rescuing him.  Zac reported that when he entered the residence, he saw Faustina and noticed the wood stove had a five-gallon propane tank on it, which he thought was "odd" and "extremely unsafe."  He was able to remove Faustina from the house.  Faustina was transported by ambulance to a hospital.  According to Schoeppner, Faustina appeared to have been burned and there was black soot around his mouth and face.

Neighbors said that appellant should have been home at the time of the fire and explosion.  Kendall noticed that both of appellant's vehicles were parked in front of the home.  Kendall found a letter on a laptop computer inside of one of appellant's vehicles that was addressed to one of her sons and read, "Alex, look at my documents and open new word document, it is for you.  Dylan's letter is under as I was going through boxes.  I'm sorry I did not finish it!  I love you both very much.  Sorry Mom."  Kendall reviewed

---

[2]The facts relating to the incident are taken from the probation officer's report. The first names of the deputies and various other individuals were not included in the report.

the letters and found they contained explanations of various events surrounding the separation of her and the children's father.  Kendall also found a letter inside appellant's mailbox that was addressed to Kelly Shannon of Danville, California.  The letter contained appellant's "last remaining money."  Based on appellant's letters to her sons and to Shannon, Kendall believed appellant may have been trying to tie up loose ends before committing suicide via arson to her residence.  Schoeppner advised that he would not be able to search the residence for bodies until the morning because the house was still "extremely hot" and unsafe to enter.

On December 15, 2010, Deputy Byrnes, who was also familiar with Faustina and appellant, went to appellant's house to conduct a follow-up investigation.  Byrnes entered the house and observed that the majority of the south side, including the living room, kitchen, hallway, rafters, and roof, had been completely burned and was open to the sky.  Schoeppner told him that fire personnel had removed from the living room a five-gallon propane tank that was missing its shut-off valve.  Schoeppner said fire personnel had conducted a search of the burned residence for other possible victims and had not found appellant.

Byrnes and Schoeppner entered the residence together.  When they got to the master bathroom, Byrnes saw what appeared to be a human body lying in a fetal position in the bathtub.  There was a blanket over the body, and there were clean, "not soot covered," feet protruding from underneath the blanket.  It appeared the blanket was dry and contained a minimal amount of soot compared to the inside of the bathroom and tub.  The blanket appeared to move slightly up and down, as if the person underneath had shallow breathing.  Byrnes called appellant's name, discovered that the person was appellant, and summoned medical help.  Appellant appeared to be fairly clean and in fair health, as she was able to walk and had minimal soot on her hands and face.  Appellant had dried pine needles in her hair.  Ambulance personnel transported appellant to a hospital.  Byrnes followed the ambulance and interviewed appellant.

3

Appellant told Byrnes that she was home with Faustina and her two dogs on the day of the incident.[3] Her sister-in-law, Barbara Daughtry, who worked for her and helped take care of Faustina, had left the prior Thursday to visit an ill family member who lived out of the area. Appellant went to fill up five and seven-gallon propane tanks and went to buy groceries before Daughtry left because she knew she would not be able to leave the house for several days while Daughtry was away, as she would be taking care of Faustina by herself. Appellant brought the five-gallon propane tank inside the house and made it to the hallway, where she ended up setting it down. She then heard Faustina cough, so she went to his room to suction out his throat, and then to her bedroom, where she laid down. She then heard a loud hissing sound and got up to see that the propane tank, which had rolled down the hallway toward her bedroom, was on fire. The room filled with smoke, and she could not breathe or see. She could not get to Faustina's room because the flaming propane tank was blocking the hallway. Later, she heard someone yell in or around Faustina's room, but knew it could not have been him, as he could not talk. Because of the smoke, appellant could not find the bedroom door that led to the outside. She decided to lie down in the bathtub in her bathroom. She got cold and retrieved a dry blanket and pants from the bathroom closet.

Appellant denied knowing how the fire started and claimed she never left the house. She went on to explain personal financial and emotional problems she had been having with her ex-husband, Allen McGinty, and her estranged children. She explained the house was in foreclosure status due to Allen not helping to pay the bills. She said she had planned to move out of the residence on the date of the interview. Appellant denied consuming any alcohol or taking any drugs the evening before the fire. She said her head hurt and that there was something in her hair; she pulled out some pine needles from her hair. Byrnes asked appellant how she got them in her hair; appellant said she did not know.

---

[3]The dogs were later found dead in the house.

4

Byrnes interviewed Amy Niesen, a hospital emergency room manager. Niesen, who was "very familiar" with appellant and Faustina from prior contacts, said that appellant did not appear to be her usual self. She was usually "concerned and demanding of the treatment Faustina received, but did not appear genuine with her inquiry as to [Faustina's] well-being." Niesen reported that before appellant was released from the hospital, her son Alex had come to visit her. Niesen was at appellant's bedside when appellant said to Alex, "Nobody checked on us for over a week, why do you think I did this?" Alex looked at appellant and began to cry. When Niesen told appellant she was being released, appellant said she could not leave because she was waiting for Byrnes to arrest her.

Byrnes also interviewed neighbor "Zac" regarding his rescue of Faustina. Zac said he knew Faustina was a quadriplegic who could not speak. On December 14, 2010, Zac was in his living room when he heard a large explosion and felt his house shake. He heard a woman yelling and a hissing sound from outside. He went outside and saw a glow coming from appellant's house and knew it was on fire. Zac told his girlfriend to call 9-1-1 and ran to appellant's house. Upon reaching the driveway, he saw a fire shooting up the wall in the corner of the living room. Zac made various attempts to gain access to the house and finally succeeded by kicking in a door until it partially opened. Thick, black smoke bellowed out of the door opening. Zac and another neighbor, Francis, heard Faustina coughing. Zac crawled into the room and dragged Faustina off the bed. Faustina's eyes were "wide-eyed open and appeared to be alert." The look in Faustina's eyes appeared to be "one of panic, as if Faustina knew he would die." After dragging Faustina outside, Zac and Francis cleared the soot from Faustina's mouth and carried him to the driveway to wait for the ambulance. Fire personnel arrived, attended to Faustina, and attempted to extinguish the fire. Zac did not see appellant during or after the fire.

On December 30, 2010, Byrnes met with appellant at her sister's home in Danville, California. Byrnes told appellant that the evidence that had been retrieved during the investigation "spoke for itself." Appellant responded, "I did it. I did not start

5

it, but I put the propane tank on the wood stove." Appellant said she had told a psychiatrist she was seeing that her life had started to "spiral downward" and it had "got[ten] worse and worse" and she could not pull herself out of it. It "pushed her over the edge" when her sister-in-law "made up a story to get some time off."

Appellant explained that it had been almost six years since her son had been in an accident, leaving him a quadriplegic. She visited Faustina in a hospital in San Jose every week until she brought him home in 2007. Conflict arose with her now ex-husband, Allen, regarding whether Faustina should be cared for in their home. On one occasion, Allen turned off Faustina's oxygen tank, which resulted in domestic violence and a restraining order. Allen moved out of the home a few months later and her two other sons also eventually moved out. Appellant hired caregivers to help with Faustina but fired them for various reasons. She felt that medical professionals "just put Faustina in a bed and left him to die." Appellant sought assistance from the county, but received no response. The only help she was able to get was from a sister-in-law.

Appellant said she was embroiled in an "extremely bitter battle" with Allen over financial issues, including ownership of the house and various outstanding bills. Appellant said Allen was not helping with the bills and that she was responsible for making all mortgage payments and car payments and covering all other expenses. Allen had also written checks against the loans, and she had just learned in November 2010 that the house was in foreclosure status. Allen, who was still a co-owner of the house, refused to sign his half of the interest over to her. Appellant said that as a result of all of the stress in her life, she decided she did not want to live anymore.

Appellant stated that she "made a plan" on December 14, 2010, after speaking with Faustina, who told her he did not want to go into a facility again and wished to die with her instead. Appellant described to Byrnes in detail how she planned to burn the house down. She placed a five-gallon propane tank and four or five oxygen tanks around the house, put Manzanita wood in the stove because she knew it would burn for a long time, gave Faustina two muscle relaxers to help him fall asleep, checked on him to make sure he was sleeping, then took four of his Percocet, a narcotic analgesic. She opened the

6

valves on the oxygen and propane tanks and left the wood stove door open. She turned one kitchen stove burner on to release propane, and laid down on her bed to sleep.

Appellant later awoke and realized her plan was not working, as the oxygen tanks were not hissing. She took some pliers and opened one of the oxygen tanks valves further, and oxygen came out. She put more wood in the fire and closed the door to the wood stove. She also turned two more kitchen burners on and placed the propane tank on the wood stove. She gave Faustina two more muscle relaxers, and she took four more Percocet. She later awoke to a hissing sound and saw something shoot down the hallway. At that point, the house was full of smoke and she could not breathe. She headed toward the glass sliding door in her bedroom, but could not remember anything that happened after that. The next thing she remembered was that she was going into the bathroom, reaching for a blanket, and covering herself up in the bathtub. She noted she had redwood needles in her hair, but did not remember going outside.

Appellant said she wanted to blow up the house because she did not want Allen to have it. She hoped to take her own life and "make sure nobody else got anything." She believed the fire would burn everything and nobody would have to deal with cleanup. Byrnes asked appellant how she communicated with Faustina. Appellant explained that Faustina responds by blinking twice to answer "yes," and once to answer "no." She said she asked him specific questions and advised him she was going to end her life. She told him her plan and asked him if he thought it would work. Faustina answered yes. When she asked him if he wanted to go to a facility or die with her, his responses indicated that he wanted to die with her. Appellant said she knew she "had to pay" for what she had done but did not want to go to prison for the rest of her life. She wished to see Faustina and start a new chapter in her life. She hoped to find a group home for Faustina in the Bay Area, where more resources were available, and where her two sisters lived. Appellant planned to find employment and housing in the Bay Area.

Byrnes later reviewed Faustina's medical reports, which showed he had been administered four liters of oxygen. Emergency medical technicians "performed oral suctioning and tracheal suctioning with a large amount of soot and burned material

removed from the oral cavity and the tracheostomy." Faustina had "evidence of soot and partial-thickness burns around the face, as well as soot on the dorsum and of the hands." "[D]ue to significant smoke inhalation, elevated carboxyhemoglobin, and significant amounts of carbonaceous material in his oropharynx and tracheostomy tube, there was a concern of burns to the lungs and possible pulmonary injury." As a result, Faustina was transferred to St. Francis Burn Center via Reach Air ambulance.

Appellant pleaded no contest to attempted voluntary manslaughter and arson, and to using a fire accelerant. On March 28, 2012, the trial court sentenced appellant to 13 years in state prison, consisting of the upper term of eight years on the arson account, a consecutive four years for the use of an accelerant, and an additional consecutive one year term for the attempted voluntary manslaughter count. Appellant filed a timely notice of appeal.

## DISCUSSION

### *Upper Term*

Appellant contends the trial court erred in imposing the upper term on the arson count. We disagree.

The trial court has wide discretion in weighing aggravating and mitigating factors. (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582.) The weighing of these factors by the sentencing court involves a flexible analysis, not a rigid numerical approach, and it is not necessary for the court to discuss each factor individually. (*People v. Thornton* (1985) 167 Cal.App.3d 72, 77; *People v. Evans* (1983) 141 Cal.App.3d 1019, 1022.) A reviewing court must presume in favor of the trial court's exercise of sentencing discretion, absent a clear showing by appellant that the sentence was capricious, arbitrary or irrational. (*People v. Giminez* (1975) 14 Cal.3d 68, 72.) Moreover, the power of the reviewing court in determining the sufficiency of the evidence to support the findings of the trial court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support such conclusions or findings. (*People v. Gragg* (1989) 216 Cal.App.3d 32, 46.) Because a sentencing court need only find an aggravating factor by a preponderance of the evidence, any credible, solid

8

evidence appearing in the record will necessarily be substantial enough to support the lower court's exercise of discretion as to sentencing factors in aggravation and mitigation. (See *People v. Preyer* (1985) 164 Cal.App.3d 568, 577.) If such evidence appears on the record, then the reviewing court must uphold the lower court's finding against appellant's challenge. (*People v. Giminez*, *supra*, 14 Cal.3d at pp. 72–73; *People v. Preyer*, *supra*, 164 Cal.App.3d at p. 577.)

Here, there was ample evidence supporting the trial court's finding that there were aggravating factors that justified the upper term on the arson count. Appellant's actions placed numerous individuals at great risk, including her quadriplegic son who she knew could not protect himself in any way, numerous firefighters, the neighbors who went inside to save her son, and other neighbors whose homes and lives could have been destroyed by the explosion and subsequent conflagration. Appellant also blew up the house, causing great financial damage, and admitted she did so in order to prevent her ex-husband from getting possession of the house, and to "make sure nobody else got anything." Moreover, she did not add just a little accelerant to start the fire; rather, she turned on oxygen tanks and propane tanks in order to blow the roof and the walls off of her house. It was also a calculated crime, as she planned the fire by purchasing propane gas, placing propane tanks strategically inside the house, and filling the stove with Manzanita wood, which she knew would burn for a long time. Finally, appellant initially denied any culpability for the offense, making up a story about inadvertently leaving a propane tank inside the house and having no idea how the fire started. She later said she started the fire and intended to kill herself as well, but there was evidence suggesting this was not true and that she had left the home before or during the fire, as there were pine needles in her hair and minimal soot on her.

The trial court relied on many of the above aggravating factors in imposing the upper term of eight years on the arson count. The court added that while "the background to the events that occurred . . . would cause anybody to have great empathy with [appellant]," it did not mitigate her unjustifiable actions. The court believed appellant had "delud[ed] [her]self to think that [her son] . . . could have entered into a

9

reasonable, rational, and informed decision" to die, and that even if she had truly believed her son wished to die, "the manner that [she] chose to accomplish" the objective placed numerous people at great risk. The court also noted that appellant "could have made life more difficult for [her] son," who "could have been gravely injured."

Even a single aggravating factor "is sufficient to impose an aggravated sentence where the aggravating factor outweighs the cumulative effect of all mitigating factors, justifying the upper prison term when viewed in light of general sentencing objectives . . . ." (*People v. Nevill* (1985) 167 Cal.App.3d 198, 202.) Here, in light of the fact that the offense involved great violence, disclosing a high degree of callousness (Cal. Rules of Court, rule 4.421(a)(1)), the victim was particularly vulnerable (rule 4.421(a)(3)), the manner in which the crime was carried out indicates a great deal of planning and sophistication (rule 4.421(a)(8)), the crime involved damage of great monetary value (rule 4.421(a)(9)), and appellant engaged in violent conduct, indicating a serious danger to society (rule 4.421(b)(1)), we conclude the trial court properly imposed the upper term.

### *Section 654*

Appellant contends the trial court erred in not staying the sentence on count one pursuant to section 654. We disagree.

Section 654 provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. In determining whether the facts call for the application of section 654, the threshold inquiry is to determine the defendant's objective and intent. If all the offenses are incident to one objective, the defendant may be punished for any one of them, but not for more than one. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) Whether a defendant acted with a singular intent and objective is a question of fact for the trial court and the court's finding will not be disturbed if it is supported by substantial evidence. (*People v. Avalos*, *supra*, 47 Cal.App.4th at p. 1583.) The "intent and objective" test is not applied broadly for purposes of section 654. Thus,

10

where a defendant entertained multiple criminal objectives that were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. (*People v. Akins* (1997) 56 Cal.App.4th 331, 338–339; see also *People v. Hicks* (1993) 6 Cal.4th 784, 790.)

Here, the trial court properly sentenced appellant. In imposing a consecutive term, the court noted, "[a]nd I think this deserves sentencing as a consecutive term rather than a concurrent because you still—if your intent had been to take your own life and to do that by means of arson or by burning the building, there was still no need—you could have accomplished that without attempting to kill your son Michael as well. In my mind, even though it's related to arson in that they both used the same means, it's still a separate action on your part, the attempted voluntary manslaughter." Appellant harbored separate intents and objectives when she committed the arson and the attempted manslaughter. The arson conviction was based on her plan of killing herself and/or destroying the house so that her ex-husband would not be able to have the house. She described the animosity between her and her ex-husband at length and admitted she "[blew] up the house" at least in part because she did not want him to have it. The attempted voluntary manslaughter conviction was based on her objective to kill her son. Because she had distinct intents and objectives in committing the two crimes, her convictions were based on separate acts that were not part of an indivisible course of conduct. (*People v. Douglas* (1995) 39 Cal.App.4th 1385, 1393; *People v. Evers* (1992) 10 Cal.App.4th 588, 602–603.) There was no error.

## DISPOSITION

The judgment is affirmed.

11

                              _____

                              McGuiness, P.J.

We concur:


_____

Siggins, J.


_____

Jenkins, J.