[Crim. No. 15910. Fourth Dist., Div. One. Apr. 23, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT NEVILL, Defendant and Appellant.

200

---

COUNSEL

Charles M. Sevilla, under appointment by the Court of Appeal, and Cleary & Sevilla for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jay M. Bloom and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WORK, J.**—Robert Nevill appeals his judgment of conviction for the shooting voluntary manslaughter of his wife, alleging the trial court denied him procedural due process at resentencing by relying on aggravating factors not used to impose his initial sentence. He further contends there is no factual support for any of the three aggravating factors used to aggravate his resentenced term.

We hold there is no constitutional or statutory bar to a sentencing court using any factor in aggravation at resentencing, so long as it is supported by the facts of the case, even though the factor was not mentioned, or was explicitly rejected, at the initial sentencing proceeding. We also find ample evidence supports the aggravated findings of victim vulnerability (Cal. Rules of Court, rule 421(a)(3))[1] and Nevill's viciousness and callousness (rule 421(a)(1)) in the manner in which he repeatedly fired his semiautomatic rifle at his helpless wife at point-blank range in their bedroom. We find the trial court erred in finding the crime was committed with a high degree of mental cruelty (rule 421(a)(1)); however, because the sentencing court found each aggravating factor standing alone outweighed all mitigating factors, the error is harmless. We affirm the judgment.

I

In an unpublished decision resolving Nevill's earlier appeal, this court found each of the four aggravating factors the trial court initially used to justify the upper term were either factually unsupported, or legally barred (premeditation and express malice, wilful mental cruelty, lack of remorse, and the overriding importance of punishment and public example). At resentencing, the trial court again used wilful mental cruelty, but based it on different facts. It also found the crime showed a viciousness and callousness transcending that inherent in the crime of voluntary manslaughter by shooting. It then determined the victim was particularly vulnerable, a finding it expressly rejected at the first sentencing.

II

Nevill contends the Rules of Court prohibit a trial court at resentencing from stating aggravating factors to support its sentence which it did not

---

[1]All references to rules are to the California Rules of Court.

expressly articulate when first imposing sentence. This argument assumes all aggravating criteria not expressly relied on by the court during its initial sentencing were rejected. Nevill cites *People* v. *Mendonsa* (1982) 137 Cal.App.3d 888, 896 [187 Cal.Rptr. 363], as holding there is a presumption the trial court considered factors set forth in a presentence report but implicitly rejected them. This is not the holding of *Mendonsa* or the cases upon which that decision relies. *Mendonsa* expressly relied on *People* v. *White* (1981) 117 Cal.App.3d 270 [172 Cal.Rptr. 612], which held, in light of rule 409, the trial court will be deemed to have considered the relevant criteria enumerated in the sentencing rules. "Hence, on the record before us, it must be presumed that the trial court did consider the mitigating circumstances listed in the probation report, *but concluded that they were outweighed by the other facts* which the trial court relied upon in selecting the upper term of imprisonment." (*Id.,* at p. 280, italics added.) There is no statement in *Mendonsa* or the cases upon which it relies, implying a presumption arises that any criterion mentioned in presentence reports was rejected solely because the trial court does not comment on it at the time of sentencing. Further, these cases only address claims a sentencing court erred by *failing to consider* mitigating factors of record at the time it imposed sentence. That is not the issue here. Nevill's contention is that the sentencing court previously considered and either expressly or impliedly rejected each aggravating factor it later relied on at resentencing.

 Rule 409 does not require the court to express every applicable aggravating factor on the record at a sentencing hearing. A single aggravating factor is sufficient to impose an aggravated sentence where the aggravating factor outweighs the cumulative effect of all mitigating factors, justifying the upper prison term when viewed in light of the general sentencing objectives stated in rule 410. Neither the cases cited by Nevill, nor public policy, requires us to presume a trial court has rejected as inappropriate, aggravating factors suggested by presentence reports when it fails to mention them. If the record factually supports factors which the Judicial Council has deemed relevant to impose an upper term of imprisonment, the public good is not served by allowing a criminal defendant to be given a lesser punishment than that which is appropriate to achieve the objectives of rule 410. Those objectives are: protecting society, punishing the defendant, deterring others from criminal conduct, and achieving uniformity in sentencing.

Achieving uniformity in sentencing requires the sentence imposed be based upon consideration of all relevant aggravating and mitigating factors. Where a sentencing court deliberately or inadvertently fails to include all significant factors in its consideration at an initial sentencing, Nevill's argument would prevent the later consideration of other relevant aggravating

factors and promote lack of uniformity in sentencing. For instance here, we are satisfied the trial court did not abuse its discretion in determining the aggravating factors upon which it relied at resentencing sufficiently outweighed the mitigating circumstances so that an upper prison term was required to meet the objectives of rule 410. We believe those stated objectives express a legitimate social value expressed in the determinate sentencing law. To promote these objectives, the trial court should not be barred from reconsidering and applying a factor in aggravation even if it were previously explicitly rejected.

### III

Nevill also claims resentencing in this manner allows courts to hold back reasons and factors in aggravation as insurance against appellate reversals and unbridles the subjective will of the sentencer, permitting it to do as it pleases. This, Nevill claims, denies him procedural due process and his due process liberty interest in fair and unprejudiced decisionmaking.

Nevill cites no direct authority for his position, nor does he allege the trial court here deliberately failed to reveal its "hole cards." However, he faults the procedure as not giving the appearance of justice. (See *Offutt* v. *United States* (1954) 348 U.S. 11, 14 [99 L.Ed. 11, 16, 75 S.Ct. 11].) We find no appearance of injustice in this record. Except for some uncertainty as to the length of his prison term, Nevill is in exactly the same position as if he had been sentenced correctly to the upper term on his initial appearance. The trial court's error in original sentencing and its conduct at resentencing has not subjected Nevill to any prison term or punishment not warranted by the character of his criminal acts. He has been afforded procedural due process at all stages during which he has been represented by extremely capable counsel. Indeed, if the circumstances of Nevill's crime warrant the upper term when reviewed in light of the objectives of the determinate sentencing law, an appearance of injustice would arise were Nevill given a lesser sentence.

### IV

We address the propriety of the individual aggravating factors. By finding Nevill guilty of voluntary manslaughter, the jury determined he intentionally killed his wife with a semiautomatic AR15 rifle Nevill removed from its plain-view position near the bed in the master bedroom to the bed, where he deliberately hid it by covering it with a sheet. He then waited for his wife to arrive. He believed it possible she would bring a male friend, but he saw her drive up to the house alone. He waited upstairs in the master bedroom until she entered the room. When his emotionally distraught, de-

fenseless wife was sitting on the bed, beside which their 16-month-old daughter was standing, Nevill removed the rifle from its hiding place, removed the safety, fired three shots in rapid succession into the floor, paused five to six seconds and then shot his wife ten times at point-blank range in the upper body. Although the 10 shots were fired in rapid succession, each required an individual trigger pull by Nevill. None missed its intended target.

Nevill had practiced firing this weapon and other rifles he kept around the house. He was familiar with the operation of the AR15 and kept it fully loaded and cocked (with the safety on) in the master bedroom for "self-protection." His expertise is shown by the relatively small area in which he was able to place 10 rapidly fired shots. This was more than a simple shooting his helpless victim to death, it was butchery.

In our previous decision, we commented that a sentencing court should fashion its sentence to fulfill the general objectives stated in rule 410, including protecting society, punishing the defendant and deterring others from criminal conduct by demonstrating its consequences. We stressed the sentence choice should make the punishment fit the crime and the criminal. Indeed, it is for this reason the Legislature designed the determinate sentencing law to enable the court to tailor its sentence to the peculiar attributes of each crime and criminal. A voluntary manslaughter arising out of a physical altercation between two persons of relatively equal physical prowess, occurring during the passion of the moment, differs significantly from an intentional killing where one person picks up a firearm and shoots another who is unarmed. Each is significantly different than the present case where Nevill's defenseless, mentally abused, unsuspecting wife is literally blown apart in the presence of her baby, in the security of her bedroom, by Nevill firing 10 individual shots from a hidden rifle into her vital organs at point-blank range. As stated in *People* v. *White, supra,* 117 Cal.App.3d 270, 282, "the facts and circumstances of this case virtually mandate the imposition of the maximum penalty allowed by law." In *White,* the reviewing court was referring to the firing of only four shots into the body of an adult male victim, two of which were administered to the head from a distance of one foot while the victim lay helpless on the floor, and the firing of five shots into a second adult male, two of which again after the victim was helpless.

V

▇ Here, the trial court stated it found the victim particularly vulnerable (rule 421(a)(3)) because she was fearful for the welfare of her child. Factually, Nevill deliberately exploited his knowledge that his wife was

afraid he would carry out his threat of running away with the baby. He admitted his knocking on the window at her place of employment and waving goodby while making rocking, cradle-like motions with his arms was deliberately intended to make his wife fearful he would leave the area with the baby. He was successful. His wife came to the parking lot where he had gotten into the car with the baby. Nevill repeated his threats and told her she could come with them if she wished. He then squealed his tires and sped away. He expected his wife would come if he took the baby because "she wouldn't leave Leasa."

As Nevill expected, his wife got her car keys from the office, left crying and drove to her home where Nevill waited in the upstairs bedroom with the baby and the AR15 hidden for instant access. When the victim entered her bedroom, a normal place of sanctuary, she was bearing bruises from a beating administered by Nevill a few days before and was emotionally distraught because of the physical and mental harassment Nevill had subjected her to for more than a month during which she lost approximately 20 pounds. She was unarmed; physically powerless against the larger, athletic Nevill; concerned about Nevill's threats to take the child away from her; and, unaware the loaded rifle was hidden on the bed. There was no one to defend her or to come to her aid, as there would have been at the place of employment had Nevill not used the baby as a pawn to lure her away. Contrary to Nevill's assertion the victim was no more vulnerable than any other person confronted with a firearm, Nevill fired his fusillade into an unsuspecting, unarmed, physically and mentally abused woman in the bedroom of her own home as she sat on the edge of her bed, and continued to blast away as she lay helpless after the initial shots. The trial court accurately found the victim was "particularly vulnerable" within the meaning of rule 421(a)(3).

We recognize the sentencing court, at the initial hearing, specifically stated it did not believe vulnerability was an appropriate factor in aggravation under the facts of the case. Nevill refers to the court's change of position at the resentencing two years later as a remarkable reversal of factfinding. Remarkable or not, the record overwhelmingly supports the existence of that factor, and a contrary finding would be factually unsupported and an abuse of discretion.

## VI

The court independently stated there was "great violence, monumental violence, by virtue of the firing of many separate shots" which was more than the degree of violence inherent in using a firearm within rule 421(a)(1). The issue of whether shooting a defenseless, disabled person

multiple times is a factor which may show a pattern of conduct over and above the violence ordinarily inherent in any intentional shooting killing was raised but not resolved in *People* v. *White, supra.* There the trial court had referred to the multiple shootings as "maximum violence" justifying its use as a factor in aggravation under rule 421(a)(1) in addition to the enhancement imposed for firearm use. The reviewing court found the court's characterization to be somewhat vague and unhelpful in its search to ascertain the trial court's reasoning. It abandoned the search as unnecessary because the error, if any, was harmless where other valid aggravating factors had been stated.

We have found no cases directly in point. Nevill questions whether there is greater violence when a person is killed with a single shot, than when 10 are used. Because death was relatively instantaneous, he assumes the extra shots inflicted no greater pain or suffering on his wife. The question posed is irrelevant; rule 421(a)(1) talks about crimes involving great violence such that they disclose a high degree of cruelty, viciousness or callousness *on the part of the perpetrator.* Here, this was not a simple shooting, it was slaughter. Nevill's point-blank mutilation shows a callousness on his part transcending that which is necessarily inherent in an intentional killing. Nevill tells us that Webster's New World Dictionary defines "callousness" as a character trait implying cold bloodedness or unfeeling. We accept that definition and hold *the shooting of an unsuspecting, unarmed, defenseless person 10 times while her 16-month-old baby is standing beside her* exhibits the vilest kind of insensitivity, more than is inherent in the statutory definitions of voluntary manslaughter by using a firearm.

In *People* v. *Harvey* (1984) 163 Cal.App.3d 90, 116-117 [208 Cal.Rptr. 910], we rejected a contention that the viciousness and callousness factors set forth in rule 421(a)(1) are inherent in the crime of an attempted homicide by use of a firearm where a defendant wilfully inflicts great bodily injury. We held there, and reaffirm it now, a trial court has the obligation to go beyond a casual reading of terms defining the factors in aggravation to convince itself whether, when compared to other ways in which a homicide by use of a firearm may be committed, the manner of this crime's commission indicated viciousness and callousness.

Further, the victim was particularly vulnerable for an additional reason; she was disabled and helpless after the first shots as she lay on the bed. (*People* v. *White, supra,* 117 Cal.App.3d 270, 282.)

## VII

As a third factor, the court found the acts of the defendant in committing the crime exhibited a high degree of mental cruelty under rule

421(a)(1). Specifically, the sentencing court found the defendant used the baby as a lure and emotional hostage to precipitate the confrontation with the victim.

The parties disagree whether the facts support the judge's finding the child was used as a lure. However, Nevill admits he made the rocking gestures at the window of his wife's place of employment to attempt to get her to come outside. She did, and he then told her he was leaving with the baby, expecting she would follow because of her emotional attachment. She did. Based upon the physical and emotional abuse he had been heaping on his wife over the past month, and the fact he believed his wife had had lunch with a boyfriend that very day, it is unrealistic to believe Nevill could have expected a meeting with his wife at the house to be anything other than the confrontation it was. However, rule 421(a) is related to *facts relating to the crime*. Here, the crime was homicide. The jury rejected the prosecution's argument the baby was used as a pawn to lure Nevill's wife to her home *for the purpose of being killed*. If the luring was for the purpose of discussing or arguing over marital difficulties, the luring would not be related sufficiently to the killing to become an element of cruelty involved in the crime. As stated in our previous decision, the jurors rejected the theory the luring was part of the crime by way of premeditation or planning.

The trial court specifically found each aggravating factor would, standing alone, sufficiently outweigh the total mitigating factors to justify the upper term imposed. This finding is not shown to be an abuse of discretion.

Judgment affirmed.

Brown (Gerald), P. J., and Wiener, J., concurred.

A petition for a rehearing was denied May 2, 1985, and appellant's petition for review by the Supreme Court was denied July 10, 1985.