Filed 11/12/15  P. v. Norton CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B257084 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA059084) |
| v. | |
| MICHAEL R. NORTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge.  Affirmed in part, reversed in part, and remanded.

Randall Conner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Michael Katz, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted defendant and appellant Michael Norton of voluntary manslaughter (Pen. Code, § 192, subd. (a)[1]) and found true the allegation that defendant personally used a firearm in the commission of the offense (§ 12022.5). The trial court sentenced defendant to a term of 21 years in state prison, consisting of the upper term of 11 years for the manslaughter conviction and a consecutive upper term of 10 years for the personal firearm use enhancement.

On appeal, defendant contends that the trial court abused its discretion in imposing upper term sentences and that defense counsel provided ineffective assistance in failing to object to the trial court's reliance on improper aggravating circumstances and failing to argue mitigating circumstances. We reverse defendant's upper term sentences for his voluntary manslaughter and personal firearm use enhancement and remand the matter for resentencing.

## BACKGROUND

### I.  The Prosecution's Evidence

In February 2013, William Mayes and three of his daughters—Karina, Tammy, and Kimberly—moved into a house on 159th Street East. Defendant lived next door.

About 6:00 p.m. on March 19, 2013, Mayes, his daughters, and other family members were home when defendant came over. Defendant and Mayes drank Jack Daniels at the kitchen table. Mayes also drank beer. Kimberly saw her father and defendant each drink four shot glasses of Jack Daniels. Shortly thereafter, defendant went home and returned with vodka and orange juice.

Some time later, then 10-year-old Kimberly heard defendant say that then 13-year-old Tammy "had big boobs and that he—that what if he impregnated her, and kissed her and married her." A fight between Mayes and defendant ensued. Defendant and Mayes punched each other. According to Tammy, Mayes told her during the fight that

---

[1]     All statutory citations are to the Penal Code unless otherwise noted.

defendant said that defendant wanted to impregnate her and thought that she was cute. Defendant said in response that Mayes was lying. Kimberly later told the police that Mayes asked defendant why he would "do that to a 13-year-old," and called him a "bad word."

The fight lasted 15 minutes and took place throughout the house, ending in the garage. Kimberly and her sisters screamed at defendant to leave, but he would not. When the fight ended, Mayes ordered defendant to leave. Defendant complied and returned to his house. The parties stipulated that after defendant returned to his house and before he later shot Mayes, he called 911.

Howard Freiberg, the father-in-law of Mayes's daughter Angela, lived about a mile and a half from Mayes's house. Angela called Freiberg around "dusk"—about 5:00 or 6:00 p.m.—and asked him to see if there was "an issue going on" at Mayes's house. Freiberg immediately went to Mayes's house where he spoke with Mayes. Mayes said that the next door neighbor had been over and Mayes and the neighbor had been drinking. Freiberg would later tell the police that Mayes appeared to be intoxicated.[2] Mayes told Freiberg that the neighbor said he wanted to marry and impregnate Mayes's 13-year-old daughter and Mayes was very upset about it. After the neighbor's statement, Mayes and the neighbor fought. Mayes told Freiberg that the neighbor got "the better of him" and people usually did not get the better of him. Mayes said, "That son of bitch—that motherfucker had the nerve to come over and jump me. He wants to impregnate my daughter." Freiberg spoke with Mayes for about three to four minutes and advised him to go in the house and call the police. "The girls" told Freiberg that they had called the police and the police said they were on the way. Freiberg then left Mayes's house.

Shortly after Freiberg left, Mayes went outside—first standing in the garage and then near the front door. While Mayes stood at the front door, he yelled, "You're going to rot." Mayes then moved to a fence that separated Mayes's property from defendant's

---

**2**    A Deputy Medical Examiner for the Los Angeles Department of Coroner testified that Mayes's blood alcohol level was .22.

property.  Kimberly did not hear her father say anything as he moved toward and stood at the fence.

As Mayes stood at the fence, Kimberly saw defendant at his front door holding a gun.  Kimberly heard two gunshots and saw a bullet hit the fence and then hit her father. Mayes suffered two gunshot wounds—one to his right ear and one to the left side of his chest.  He died from the gunshot wound to his chest.

Defendant's and Mayes's neighbors Justin Clark and Alex Escobar testified about the shooting.  Clark lived on 159th Street East two houses from Mayes's house.  Between 6:00 and 7:00 p.m. on March 19, 2013, Clark was sitting on his front porch and heard two men yelling at each other from the location of the shooting.  The first man yelled, "You're a fucking pervert, you're a dead man you fucking pervert, that's my daughter." Clark also heard that man say, "I'm going to fucking kill you."  The second man respond, "You're making this up," "You got it wrong," or "You're mistaken."  The yelling stopped for a few minutes and then resumed for a period of time.  It stopped for more than five minutes and then resumed for a period of time.  The yelling stopped for about two minutes and Clark heard two gunshots.  Clark told the police that night that he heard, "You're a fucking dead man, I'm going to fucking kill you, do you understand me" followed shortly by two gunshots.

Escobar lived across the street and three houses from defendant's house.  About 7:00 or 8:00 p.m. on March 19, 2013, Escobar was in his front yard washing his car when he saw a man in Mayes's front yard.  The male repeatedly yelled, "You dead man, you dead man, fuck you."  He also saw a female come out of the house and heard her say, "Dad, come inside, dad, come inside."  The man remained outside.  Escobar saw defendant walk out his front door.  The man in Mayes's front yard said "the same things, 'You're a dead man.'"  Escobar then heard two gunshots and saw the man in Mayes's front yard and the female run towards Mayes's house.  Defendant was on his property when the gunshots were fired.

Los Angeles County Sheriff's Department Sergeant Brian Schoonmaker searched defendant's house and found a Sturm Ruger .357 magnum revolver on a kitchen counter.

4

Sergeant Schoonmaker searched Mayes's front yard and house.  He did not find a firearm.

Los Angeles County Sheriff's Department Detective Timothy O'Quinn interviewed defendant following the shooting.  Defendant said that when he went home, he thought the dispute with Mayes was over.  When he heard Mayes "screaming I'm gonna kill you," he armed himself with a gun.  Defendant went outside and Mayes again said that he was going to kill defendant.  Mayes previously had told defendant he had a gun.  Because Mayes "blew up" at his children all the time, defendant believed that Mayes had a violent nature and could "blow up at any minute and do anything."

Defendant told Detective O'Quinn that Mayes "was coming towards [him] screaming" and he thought Mayes was going to "pull a gun out."  Mayes had told him that he was a convicted felon and had weapons.[3]  Detective O'Quinn asked defendant if he saw a gun.  Defendant responded, "I didn't see, it was dark out there.  He said I'm gonna kill you and I thought he had a gun.  Um but I didn't . . ."  Later, he said, "I couldn't see, it was, there were trees and it was already dark any way."  He said that he thought that Mayes was going to shoot him, so he shot first.  As he pulled the trigger, he thought, "I'm gonna hit him before he hits me."

Defendant said, "I never meant to hurt anyone and this man was more irate than anyone I have ever seen blow up.  I didn't mean any offense, whatever it is.  It's uh it's there was no listening, he was just coming and he started coming towards me, right.  [¶]-[¶]  Yelling and screaming and I . . . um . . . I maybe overacted but I did not intend to kill the guy."

II.     **Defendant's Evidence**

Defendant testified in his own behalf.  He said that he met Mayes when Mayes first moved to the neighborhood, about three weeks prior to the shooting.  Mayes had a group of people at his house and had waved to defendant to come over.  Defendant stayed

_____

**3**      The trial court admitted a California Law Enforcement Telecommunications System (CLETS) printout that did not show any prior arrests or convictions for Mayes.

for about an hour and, at some point during that hour, brought vodka and orange juice to Mayes's house. Defendant did not return to Mayes's house prior to the day of the shooting.

On the day of the shooting, defendant went to Mayes's house because he believed that Mayes's children or "[s]ome children in his direction," had been throwing stones at defendant's house. Defendant wanted Mayes to know so that he could tell the children to stop. Defendant brought two bottles of beer with him. Defendant saw Mayes through an open door, and Mayes waved defendant into the kitchen. Defendant asked Mayes if he knew that his children had been throwing stones at defendant's house. Mayes said he knew about the issue and had "yelled at them real good about it." That ended the issue for defendant.

Mayes was drinking Jack Daniels and offered defendant a drink. Defendant drank two shots of Jack Daniels. Mayes introduced Tammy and Karina to defendant. Mayes said, "They're cute, aren't they?" Defendant responded, "Yes, they're both lovely daughters, Bill." Mayes said, "And they're both virgins, too. [¶]-[¶] And they're going to remain virgins. And guess when they won't be virgins anymore[?] . . . When they're married." Mayes then told defendant about "what the qualities of their husbands potentially would have to be." Referring to Karina, defendant replied, "In a couple years, I'm sure she'll probably be begging you, Bill." Defendant meant that she would be begging him to get married. Mayes responded, "I'm gonna kill you." Defendant replied, "It's not me. I'm not—it wasn't me. I was [*sic*] talking about me as the husband." Defendant had been sitting with Mayes at the kitchen table for about 10 minutes when the argument started.

Mayes did not appear to be listening to defendant. Mayes pushed the base off the table and it fell to the floor, breaking into "a million pieces." Defendant started to get up, but Mayes pushed him and he fell to the floor. While defendant was on the floor, Mayes repeatedly said, "I'm gonna kill you" and "You're a dead man." The entire time defendant remained in Mayes's house, Mayes said "I'm going to kill you or you're a dead

6

man, or you're a pervert, she's only 13." Defendant denied having said anything about Tammy. Mayes repeatedly grabbed at and punched defendant.

Defendant defended himself by pushing Mayes away. He did not punch Mayes. The entire fight took place in the kitchen and lasted a minute and a half or two minutes. Mayes said, "Get out." As defendant tried to leave through the garage, Mayes tackled him and he fell face first onto the garage floor. Mayes continued to "punch at" defendant and yell, "I'm gonna kill you. You're a dead man. . . . And you're a pervert." Defendant took Mayes seriously.

The altercation in the garage lasted about two minutes. At some point, defendant gained the upper hand and was on top of Mayes. In order to get away, defendant put his right thumb in Mayes's left eye and pushed hard enough to get Mayes's attention. Defendant told Mayes to let him go, Mayes complied, and defendant left.

When defendant returned home, it was almost dark outside and was getting darker by the minute. Defendant left his front door and a security door open. About 30 seconds later, Mayes started yelling again. Mayes yelled, "I'm gonna to kill you, you're a dead man." Defendant called 911. He then grabbed a gun—"a .357." He opened the chamber and made sure it was fully loaded. He was afraid that defendant might be coming after him and that Mayes had had time to arm himself. Mayes previously told defendant that he had a gun—a Luger. Defendant looked out his door to see if defendant was coming. Mayes yelled for about a minute.

About eight to 10 minutes later, after Mayes had "quieted down" and stopped yelling, defendant stepped outside to look for his dog which he believed had run outside when he opened the door. The area was illuminated only by defendant's porch light and light emitted through his front door. Defendant could not see past the house.

Still armed with the handgun, defendant approached a tree and whispered for his dog. Mayes either saw or heard defendant and came out of his garage yelling, "I'm gonna kill you. [¶]-[¶] You're a fucking pervert. I'm gonna kill you. Do you hear what I'm—do you understand." Then, to "solidify" his threat, Mayes asked, "Do you

7

understand, do you understand, do you understand what I'm saying." Defendant froze and did not attempt to go in his house.

Mayes approached on the "sidewalk." The porch stopped him from advancing farther. Mayes moved back and forth on the "sidewalk" yelling, "I'm gonna to kill you." Defendant responded, "No, Bill, it's a mistake, you didn't understand what I was saying. [¶]-[¶] It's a misunderstanding. It's a mistake, you're making this up in your mind." Defendant and Mayes "yelled back and forth like that for about four minutes maybe." At some point, Mayes yelled, "I'm gonna kill you and his voice changed a little bit to more of a matter of factly sounding, I'm gonna kill you, you know like, calmer, more honest sounding." Mayes was "gesturing and he came rushing" towards defendant. The light was behind Mayes. Defendant thought that Mayes was armed with a gun and was going to kill him. Defendant was in fear for his life, fired two shots—"up and down"—at Mayes, and ran in his house and called 911. Defendant did not know how close Mayes was when he fired the shots—he starting firing when Mayes suddenly started moving towards him.

Asked on cross-examination if he ever saw a gun in Mayes's hand, defendant responded, "Not definitely." Asked if he "ever kind of [saw] a gun in [Mayes's] hand, defendant responded, "Yes." He said he thought he saw a gun in Mayes's right hand. He explained that "light flashed off of him as he came by." Defendant saw "a flicker of light"—"like an interruption in the light that was coming off—off the area. And there was—it was all the combination of things all at one time, the sudden advancement, the yelling and the—" The prosecutor asked, "Did you ever see a gun, sir?" Defendant responded, "If he didn't have one, how could I have seen it?" The trial court asked defendant, "Is that no?" Defendant responded, " I didn't actually." The trial court asked defendant, "Did you see a gun, 'yes' or 'no." Defendant replied, "I saw what I thought was a gun." He acknowledged that he did not tell the 911 operator or Detective O'Quinn that he thought he saw a gun. During the period when he walked home after the fight until he shot Mayes, defendant did not see Mayes outside of Mayes's property or on defendant's property.

8

Rafael Morales, defendant's and Mayes's neighbor, testified that when he was driving home two weeks before the shooting, Mayes said that he did not like the way Morales "passed by with [his] car." Mayes said that if Morales drove again in the same manner, Morales was going to have a problem, Mayes would fight him, and Mayes would kill him. Morales continued to drive down Mayes's street after Mayes's threat and Mayes did not say anything to him.

Dr. Kevin Booker, a trauma specialist whose job "involve[d] debriefing men and women who have served in the United States military who have been involved in combat operations," testified that when a person perceives that his life is threatened, the person's autonomic nervous system "essentially overrides the individual's behavior and takes over and facilitates" certain responses including fight or flight. The fight or flight response can still be in effect even if there has been a five to 15 minute period during which the person has returned to a place of safety and there have been no threats.

The jury, utilizing imperfect self-defense, found defendant guilty of voluntary manslaughter.

## DISCUSSION

### I. Defendant's Upper Terms for His Voluntary Manslaughter Conviction and Personal Firearm Use Enhancement

Defendant contends that the trial court abused its discretion when it sentenced him to the upper terms for his voluntary manslaughter conviction and personal firearm use enhancement. He argues that the trial court relied on improper aggravating circumstances and failed to consider mitigating circumstances.

9

A.      *Background*

In its sentencing memorandum, the prosecution argued for the upper term of 11 years for defendant's voluntary manslaughter conviction (§ 193, subd. (a)[4]) and the upper term of 10 years for the personal use of a firearm (§ 12022.5[5]). The prosecution contended that the upper terms were appropriate based on the aggravating circumstances that defendant's crime involved great violence, great bodily harm, and a high degree of cruelty, defendant was armed with and used a firearm, and Mayes was vulnerable.

At defendant's sentencing hearing, the trial court stated that it had read and considered the prosecution's sentencing memorandum. It stated that it also had read and considered several letters submitted by defendant's family members, friends, and neighbors. The prosecutor read victim impact statements from several of Mayes's friends and family members. Mayes's friends John and Gail Degen stated that Mayes was a great friend and father, very kind, giving, and willing to help those in need. Michael Freiberg, Mayes's son-in-law, said that Mayes was a single father with six children who went to work every day and had dinner on the table every night. Freiberg stated that Mayes was an "awesome father" whose children meant the world to him. He stated that Mayes's death had "robbed" Mayes and his children of the various activities they engaged in together—riding motorcycles, fishing, camping, and boating. Like others, Freiberg said, he was horribly affected by Mayes's death. He believed that defendant deserved the maximum sentence.

Pedro Renteria, Jr., Mayes's son, described Mayes as a great father with a wonderful and outgoing personality. Mayes taught Renteria many things when he was a child. After Mayes's death, Renteria, a father of two, took in and served as father to his

---

[4]      Section 193, subdivision (a) provides, "Voluntary manslaughter is punishable by imprisonment in the state prison for 3, 6, or 11 years."

[5]      Section 12022.5, subdivision (a) provides, "Except as provided in subdivision (b), any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense."

10

sister Tammy. Renteria's sister Elizabeth took responsibility for their other sisters, Karina and Kimberly. Renteria said, "With him being gone, me being the oldest, I have some big shoes to fill that I wasn't ready to fill. I still had a lot to learn from my father." Renteria felt stress every day trying to take care of his family and making sure that his sisters were okay. Because of defendant's actions, Renteria's sisters were separated and would not grow up together and Mayes would not be able to watch his children and grandchildren grow. Defendant had made Renteria's and his sisters' lives "a never ending nightmare."

Tammy spoke of the difficulty of losing Mayes, whom she described as an "amazing" father, at the age of 13 and not having her father present for birthdays and holidays. She stated that she and her sisters had been separated and expressed uncertainty about her future without her father's presence at significant life moments.

Angela Mayes-Freiberg also described Mayes as an "amazing" father. Mayes was devoted to his children. Defendant's actions had "ruined" and torn apart her family. She stated that defendant deserved the maximum possible sentence.

Defense counsel argued that this was a low term case. He stated that defendant had no prior convictions and had "lived an exemplary life."

The trial court then stated its "concerns" as follows:

"The choices of [defendant], while he has been what appears to be a very good law-abiding citizen, a good neighbor and a good friend, his choices have affected many, not one, not two, but five children and the grandchildren. He will never have the opportunity to walk his daughters down the aisle, watch them graduate or see the birth of his future grandchildren.

"They will never know their father and grandfather in their older ages. You've take [*sic*] from them something they can never ever replace.

"And as I heard you testify, I wasn't completely convinced on the level of remorse. I think now you regret the decisions that you made, although you haven't stated that to the Court, nor have you apologized to the family. Because this isn't a question of

11

whether you shot him.  It was a question of what your mental state was, and the jury made that finding and I'll be bound by that decision.

"But I didn't hear you say to the family, I am so sorry for the loss of your father. So I'm not hearing any remorse, and I think the decision initially to arm yourself unnecessarily was largely influence by the alcohol.  You might not have done that if you were in another situation and thinking clearly.  You may not have made that choice.  You may not have shot at the distance you did through a chain link fence at an unarmed man.

"I think those are factors to consider, but they were choices that you made.  And your choices have resulted in the death of a father and a grandfather unnecessarily.

"I do find that there are factors and circumstances in aggravation that greatly outweigh the fact that you have lived what appears to be on paper a law-abiding life, and those would include this crime involved great violence, great bodily harm, and the high degree of cruelty and callousness.  You shot across a yard where you could not see clearly at what was an unarmed man through a chain link fence."

Defendant stated, "I did not."

The trial court responded, "Well, sir, he wasn't close enough for you to see him up close and personal.  There's nothing that would have stopped you from standing your ground if [*sic*] chose to do that.  Or in the alternative, call the police and stay inside.  You made the choice to arm yourself and go outside.  That was not required or necessary.

"All you had to do was wait for law enforcement to arrive.

"You also shot into an area where you knew there were three young girls because they were all in the home.  And had they been out there with their father, they may also been victims in this case.  These are clearly your choices.

"And by your statements now, I see that you don't get it, and that's part of what the problem is here.  You were, in fact, armed during the commission of the crime, and you have engaged in violent conduct which indicates you are, in fact, a serious danger to society.

"As we sit here today in your mind, I think you feel you're justified in doing what you did."

Defendant objected that he did not feel justified. Defendant counsel argued that defendant had never said that he felt justified.

The trial court said, "I think he said he didn't know he was unarmed as if it was okay to have shot."

Defendant replied, "No, I thought I was under attack."

The trial court responded, "Okay. Sir, I'm saying that's what you represented; I don't accept that. The jury didn't accept it. If they did, they would have found you not guilty. But I don't accept that. At the distance and the circumstances that were testified to, I do not accept that.

"You may have yourself convinced of that. The jury rejected that and so do I. At those distance under those circumstances. And with the lighting the way that it was. That's this court's position.

"I do believe the high base term is appropriate based on that. Those factors and I do acknowledge you have no documented criminal history . . . ."

The trial court then sentenced defendant to the upper term of 11 years for his voluntary manslaughter conviction and 10 years for the personal firearm use enhancement.


### B.    *Application of Relevant Principles*

A trial court's sentencing choices are discretionary. (§ 1170, subd. (b) ["When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. . . . The court shall select the term which, in the court's discretion, best serves the interests of justice"].)  We review such choices for an abuse of that discretion—i.e., "sentencing discretion must be exercised in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an 'individualized consideration of the offense, the offender, and the public interest.' [Citation.] . . . [A] trial court will abuse its discretion under the amended scheme if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an

13

improper basis for decision.  [Citations.]"  (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)  "When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper."  (*People v. Price* (1991) 1 Cal.4th 324, 492.)

California Rules of Court, rule 4.420(b)[6] provides, "In exercising his or her discretion in selecting one of the three authorized prison terms referred to in section 1170(b), the sentencing judge may consider circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision.  The relevant circumstances may be obtained from the case record, the probation officer's report, other reports and statements properly received, statements in aggravation or mitigation, and any evidence introduced at the sentencing hearing."  A trial court may use the same "fact or facts to aggravate both a base term and the sentence on an enhancement."  (*People v. Moberly* (2009) 176 Cal.App.4th 1191, 1198.)  "Only a single aggravating factor is required to impose the upper term [citation]."  (*People v. Osband* (1996) 13 Cal.4th 622, 728.)

### 1.        Aggravating Circumstances

"An aggravating circumstance is a fact that makes the offense 'distinctively worse than the ordinary.'"  (*People v. Black* (2007) 41 Cal.4th 799, 817, overruled on other grounds by *Cunningham v. California* (2007) 549 U.S. 270.)  Defendant lists 11 aggravating circumstances he contends the trial court improperly relied on in sentencing him to upper terms.  Of those circumstances, the trial court expressly identified four— great violence, great bodily harm, a high degree of cruelty, and a high degree of callousness—as aggravating circumstances it relied on in imposing upper terms. Defendant infers the remaining seven aggravating circumstances—victim vulnerability, serious danger to society, "family bereavement," lack of remorse, intoxication, unreasonable self-defense, and use of a firearm—from background remarks the trial court

---

[6]        All citations to rules are to the California Rules of Court.

made at the sentencing hearing and from the trial court's responses to remarks defendant made. We will address the four aggravating circumstance on which the trial court expressly relied. Because the Attorney General only contends that two of defendant's additional seven inferred aggravating circumstances—serious danger to society and "family bereavement"—support the upper terms, we limit our discussion of defendant's additional inferred aggravating circumstances accordingly.

a. Great violence

The trial court found that defendant committed the voluntary manslaughter and personally used a firearm with great violence, an aggravating circumstance under rule 4.421(a)(1). The trial court did not explain the factual basis for its finding. Defendant presumes that the trial court based its finding on the fact that defendant fired two shots at Mayes. He argues that the evidence did not establish great violence. The Attorney General does not address this argument, taking the position that other aggravating circumstances support the upper terms.

To be an aggravating factor, the violence with which a crime was committed must be such that it "disclos[es] a high degree of cruelty, viciousness, or callousness." (Rule 4.421(a)(1).) Violence is inherent in any voluntary manslaughter committed with a firearm. (*People v. Nevill* (1985) 167 Cal.App.3d 198, 206 [husband, convicted of voluntary manslaughter, acted with great violence when he shot his disabled wife with a rifle 10 times at point blank range].) To qualify as great violence, the manner in which a voluntary manslaughter with a firearm was committed must indicate cruelty, viciousness, or callousness "when compared to other ways in which a homicide by use of a firearm may be committed." (*Ibid.*)

Defendant fired two shots at Mayes from a distance in the dark after Mayes threatened to kill him. He struck Mayes in the ear and the chest. Defendant did not commit Mayes's homicide with violence beyond that inherent in every voluntary manslaughter committed with a firearm. (*People v. Nevill, supra,* 167 Cal.App.3d at p. 206.) That is, defendant did not commit the offense in a manner that made it or the

15

personal firearm use "'distinctively worse than the ordinary'" voluntary manslaughter or personal firearm use. (*People v. Black, supra,* 41 Cal.4th at p. 817.) Accordingly, the trial court erred in finding the great violence aggravating circumstance.

b.      Great bodily harm

The trial court found that defendant inflicted great bodily harm in committing the voluntary manslaughter and in personally using a firearm, an aggravating circumstance under rule 4.421(a)(1). The trial court did not explain the factual basis for its finding. Defendant presumes that the trial court based its finding on the fact that defendant caused Mayes to die. Defendant argues that in all voluntary manslaughters committed with a firearm, the victim suffered death—"the greatest of all bodily harm[s]"—and therefore, under *People v. Black, supra,* 41 Cal.4th at page 817, his "infliction of great bodily harm did not make his offense worse than other voluntary manslaughters or make him deserving of more punishment." The Attorney General does not address this argument, taking the position that other aggravating circumstances support the upper terms.

"A fact that is an element of the crime upon which punishment is being imposed may not be used to impose a greater term." (Rule 4.420(d).) "[B]y definition, manslaughter involves the killing of a human being (see Pen. Code, § 192); death—the greatest of all bodily harm—is therefore an element of this crime." (*People v. Piceno* (1987) 195 Cal.App.3d 1353, 1357 [vehicular manslaughter without gross negligence].) Because Mayes's death was an element of defendant's voluntary manslaughter offense, the trial court erred in finding the great bodily harm aggravating circumstance.

c.      High degree of cruelty

The trial court found that defendant committed the voluntary manslaughter and personally used a firearm with a high degree of cruelty, an aggravating circumstance under rule 4.421(a)(1). The trial court did not explain the factual basis for its finding. Defendant contends that the trial court's statement that he chose to arm himself and unnecessarily go outside rather than wait for law enforcement to arrive suggests that the

trial court construed his conduct as intending to provoke Mayes into an unequal confrontation thereby disclosing a high degree of cruelty. He further contends that the trial court appeared to construe his act of shooting Mayes in "near-dark" conditions as evidence of cruelty. He argues that neither his choice to go outside armed nor his act of shooting Mayes in near-dark conditions established a high degree of cruelty. Again, the Attorney General does not address this argument, taking the position that other aggravating circumstances support the upper terms.

The basis for the trial court's high degree of cruelty finding is unclear. As stated above, the trial court did not explain the basis for its finding. We reject defendant's interpretation of the cited remarks of the trial court as being the basis of the trial court's cruelty finding. "Cruelty" is "the quality or state of being cruel **:** disposition to inflict pain or suffering or to enjoy its being inflicted **:** inhumanity." (Webster's 3d New Intern. Dict. (1981) p. 546.) Because defendant's acts of arming himself and going outside rather than waiting for law enforcement to arrive and shooting Mayes in near darkness did not reflect a disposition to inflict pain or suffering or to enjoy its being inflicted, there is no reason to conclude that the trial court relied on such conduct to find a high degree of cruelty.

Defendant's voluntary manslaughter and personal use of a firearm can be summarized as follows: after an argument precipitated by defendant's offensive comments about Mayes's daughter, an ensuing fight, and repeated death threats by Mayes, defendant shot Mayes twice and killed him. The shooting and defendant's personal use of a firearm under these circumstances do not support a finding that defendant was so disposed to inflict pain or suffering or to enjoy its being inflicted as to have made Mayes's homicide or defendant's personal firearm use "'distinctively worse than the ordinary'" voluntary manslaughter or personal firearm use. (*People v. Black, supra,* 41 Cal.4th at p. 817.) Accordingly, the trial court erred in finding the high degree of cruelty aggravating circumstance.

17

d.    High degree of callousness

The trial court found that defendant committed the voluntary manslaughter and personal use of a firearm with a high degree of callousness, an aggravating circumstance under rule 4.421(a)(1). Defendant contends that the basis for the trial court's high degree of callousness finding was its determination that he endangered the lives of the Mayes children when he shot their father. For this contention, defendant relies on the trial court's statement at sentencing that he "shot into an area where [he] knew there were three young girls because they were all in the home. And had they been out there with their father, they may also been victims in this case." Defendant contends that the facts precluded a finding that Kimberly, Tammy, or Karina was in the line of fire when he shot their father. According to the defendant, although the evidence shows that Kimberly was outside at the time of the shooting, Escobar's testimony placed her out of the line of fire. He also contends that the evidence shows that Tammy was inside the house, and no evidence shows that Karina was outside.

The Attorney General argues that the trial court's high degree of callousness finding is supported by defendant's statement to Detective O'Quinn that Mayes was on his own property when defendant shot him, defendant admitted that he did not have a good reason when he decided to come out of his house to confront Mayes, and defendant testified that he was unable to see if Mayes was armed because a tree blocked his view and it was dark outside. Given those circumstances, the Attorney General argues, defendant was "exceptionally callous when he shot Mayes dead."

We do not agree with either defendant's or the Attorney General's asserted basis for the trial court's high degree of callousness finding. Instead, we believe that the basis for the trial court's finding is disclosed in remarks the trial court made concerning the jury's verdict and what the trial court believed the jury, by its verdict, said about defendant's mental state.

A person acts in a callous manner when he acts without regard for the feelings or welfare of others. (Webster's 3d New Intern. Dict., *supra*, p. 319; see *In re Scott* (2004) 119 Cal.App.4th 871, 891 ["'callousness—i.e., lack of emotion or sympathy, emotional

18

insensitivity, indifference to the feelings and suffering of others'"].) The jury returned a voluntary manslaughter verdict based on imperfect self-defense. Thus, consistent with the trial court's instruction on imperfect self-defense voluntary manslaughter, the jury found that defendant "actually believed that he was in imminent danger of being killed or suffering great bodily injury" and he "actually believed that the immediate use of deadly force was necessary to defend against the danger" but "[a]t least one of those beliefs was unreasonable."

At the sentencing hearing, the trial court stated, "[T]his isn't a question of whether you shot him. It was a question of what your mental state was, and the jury made that finding and I'll be bound by that decision." Later during the sentencing hearing, when defendant stated that he shot Mayes because he thought was under attack, the trial court responded, "Okay. Sir, I'm saying that's what you represented; I don't accept that. The jury didn't accept it. If they did, they would have found you not guilty. But I don't accept that. At the distance and the circumstances that were testified to, I do not accept that. [¶] You may have yourself convinced of that. The jury rejected that and so do I."

The trial court stated it would be bound by the jury's decision on defendant's mental state when he shot Mayes. The trial court's other comments, however, indicate the trial court may have incorrectly understood the ramification of the jury's finding.

Contrary to the trial court's comments, the jury did not reject defendant's claim that he believed he was under attack when he shot Mayes, nor is it the case, as the trial court stated, that the jury would have acquitted defendant if it accepted his claim that he believed he was under attack. Instead, in returning its imperfect self-defense voluntary manslaughter verdict the jury found that defendant *actually* believed he was in imminent danger of being killed or suffering great bodily injury and *actually* believed that the immediate use of deadly force was necessary when he shot Mayes, but thought that one or both of those beliefs was unreasonable.

Having stated it would be bound by the jury's decision on defendant's mental state, the trial court was obligated to proceed on the understanding that defendant actually

19

believed in the need for self-defense.  That understanding is inconsistent with the trial court's reliance on a "high degree of callousness" as an aggravating sentencing factor.  Instead of a callous action, one undertaken without regard for the feelings or welfare of others, defendant fired the two shots because, in the jury's view, he actually believed he must use deadly force lest he himself suffer death or great bodily injury.  (See *People v. Sandoval, supra,* 41 Cal.4th at p. 841 [in assessing harmlessness, court could not conclude jury would have found defendant was callous, i.e., that she had "no concern regarding the consequences of her actions" when jury convicted only on lesser included offense of voluntary manslaughter].)  Accordingly, callousness was not established as an aggravating circumstance.

### e.  Serious danger to society

Apart from the aggravating circumstances on which the trial court expressly relied, the Attorney General contends that defendant's upper terms are supported by the trial court's finding that he engaged in violent conduct that indicated he is a serious danger to society, an aggravating circumstance under rule 4.421(b)(1).  According to the Attorney General, "Given the way [defendant] senselessly killed Mayes, there is a significant risk that he would kill another innocent person if he were allowed to remain at large."

At sentencing, the trial court stated to defendant, "[Y]ou have engaged in violent conduct which indicates you are, in fact, a serious danger to society."  The trial court's statement appears to have been based on the fact that defendant shot Mayes twice and killed him.  As set forth above, violence is inherent in any voluntary manslaughter committed with a firearm.  (*People v. Nevill, supra,*167 Cal.App.3d at p. 206.)  The level of violence defendant engaged in in committing the voluntary manslaughter and personally using a firearm causing is unremarkable compared with other voluntary manslaughters and firearm uses and does not support a finding that defendant poses a more serious to society than other persons similarly convicted.  Thus, to the extent that

20

the trial court imposed the upper terms based on its finding that defendant's violence indicated that he is a serious danger to society, the trial court erred.[7]

### f. "Family bereavement"

Also apart from the aggravating circumstances on which the trial court expressly relied, the Attorney General contends that defendant's upper terms are supported by the trial court's finding that defendant's conduct "deeply impacted Mayes's family." The Attorney General argues that the trial court properly relied on the victim impact statements. Relying on *People v. Levitt* (1984) 156 Cal.App.3d 500, 516-517, which held that the bereavement of the victim's family cannot "properly be relied on to aggravate [a defendant's] sentence because it bears no rational relationship to [the defendant's] degree of culpability," defendant counters that "family bereavement" never is an appropriate aggravating circumstance.

Under the Victims' Bill of Rights, a trial court properly may consider victim impact statements in connection with sentencing. (§ 1191.1[8]; *People v. Jones* (1992) 10 Cal.App.4th 1566, 1574-1576.) At the sentencing hearing, the trial court said, "The choices of [defendant] . . . have affected many, not one, not two, but five children and the grandchildren. He will never have the opportunity to walk his daughters down the aisle, watch them graduate or see the birth of his future grandchildren. [¶] They will never

---

[7] Contrary to the Attorney General's suggestion, the issue is whether defendant's violence poses a serious threat to society and thus supports upper terms; defendant will not be "allowed to remain at large" based on our holding that the trial court improperly relied on this aggravating circumstance.

[8] Section 1191.1 provides, in relevant part: "The victim, or up to two of the victim's parents or guardians if the victim is a minor, or the next of kin of the victim if the victim has died, have the right to appear, personally or by counsel, at the sentencing proceeding and to reasonably express his, her, or their views concerning the crime, the person responsible, and the need for restitution. The court in imposing sentence shall consider the statements of victims, parents or guardians, and next of kin made pursuant to this section and shall state on the record its conclusion concerning whether the person would pose a threat to public safety if granted probation."

know their father and grandfather in their older ages. You've take [*sic*] from them something they can never ever replace." The victim impact statements showed the important role that Mayes, a single father, played in his children's lives and the importance of that role to Mayes. By killing Mayes, defendant deprived Mayes of the opportunity to raise his younger children and participate in the lives of all of his children. The trial court properly relied on the victim impact statements in its sentencing considerations. (§ 1191.1; *People v. Jones, supra,* 10 Cal.App.4th at pp. 1574-1576.)

### 2. Mitigating Circumstances

Defendant contends that the trial court erred in failing to consider as mitigating circumstances victim provocation (rule 4.423(a)(2)), that the voluntary manslaughter was committed because of an unusual circumstance (rule 4.423(a)(3)), that he suffered from a mental condition that reduced his culpability (rule 4.423(b)(2)), and that he voluntarily acknowledged wrongdoing at an early stage of the criminal process (rule 4.423(b)(3)). Defendant's contention is unavailing.

On appeal, we deem the trial court to have considered all relevant sentencing criteria "unless the record affirmatively reflects otherwise." (Rule 4.409; *People v. Zamora* (1991) 230 Cal.App.3d 1627, 1637 ["unless the record affirmatively reflects otherwise, the trial court will be deemed to have considered the relevant criteria, such as mitigating circumstances, enumerated in the sentencing rules"].) Here, the record does not affirmatively reflect that the trial court failed to consider all relevant mitigating circumstances. Accordingly, defendant's contention that the trial court failed to consider the claimed mitigating circumstances fails. (Rule 4.409; *People v. Zamora, supra,* 230 Cal.App.3d at p. 1637.)

Defendant relies on *People v. Burney* (1981) 115 Cal.App.3d 497, 505 for the proposition that "[w]hile the Rules of Court establish a rebuttable presumption that the trial court has considered all relevant sentencing criteria (rule 4.409), the court's statements at sentencing, interpreted in light of the record, may rebut the rule 4.409 presumption." Defendant overstates the holding in *People v. Burney*. Rebuttal occurs

under *People v. Burney* only when the trial court found that were no mitigating circumstances—"'The Court finds no circumstances in mitigation'"—but the record reflects that there were mitigating circumstances. (*Ibid.*) Here, unlike in *People v. Burney*, the trial court found a circumstance in mitigation—defendant had no prior record of criminal conduct (rule 4.423(b)(1)).[9] Accordingly, there can be no rebuttal under *People v. Burney*. (Rule 4.409; *People v. Zamora, supra,* 230 Cal.App.3d at p. 1637.)

### 3. Prejudice

We have held that the trial court improperly relied on four aggravating circumstances—great violence, great bodily harm, high degree of cruelty, and serious danger to society. We further explained the reasons why the trial court's comments on a high degree of callousness indicate the trial court likely misapprehended the jury's mental state finding, and in so doing, incorrectly relied on a high degree of callousness as an aggravating factor. Without these five aggravating circumstances, the trial court would have been left with one valid aggravating circumstance, the impact on the victim's family. We recognize that a trial court may rely on a single aggravating circumstance to support an upper term sentence. (*People v. Osband, supra,* 13 Cal.4th at p. 728.) Under the facts of this case, however, where many of the factors expressly relied on by the sentencing court have proven to be unsupported, we believe it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper. (*People v. Price, supra,* 1 Cal.4th at p. 492; *People v. Avalos* (1984) 37 Cal.3d 216, 233.) Our disposition does not preclude the trial court on remand from finding additional aggravating or mitigating circumstances or rejecting any claimed aggravating or mitigating circumstances.

---

[9] Because the trial court did not find an absence of mitigating circumstances and rule 4.409's presumption thus cannot be rebutted under *People v. Burney, supra,* 115 Cal.App.3d at page 505, we do not determine whether the record supports the contended mitigating factors.

**II.   Ineffective Assistance of Counsel**

Defendant contends that defense counsel provided ineffective assistance in failing to object to the trial court's reliance on improper aggravating circumstances and failing to argue for mitigating circumstances.  Because we have reversed defendant's sentence and remanded for resentencing, we need not reach this issue.

## DISPOSITION

Defendant's upper term sentences for his voluntary manslaughter and personal use of a firearm enhancement are reversed, and the matter is remanded to the trial court for resentencing.  The judgment is otherwise affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, Acting P. J.


I concur:



BAKER, J.


24

KRIEGLER, J., Dissenting

People v. Michael Norton

B257084

I respectfully dissent. Aided by the probation report and the prosecutor, the trial court improperly found several irrelevant aggravating factors in imposing sentence. Because there are three appropriate aggravating factors, and given the enormity of defendant's crime, any error committed by the trial court in relying on unauthorized factors in aggravation of punishment is nonprejudicial under Article VI, section 13 of the California Constitution.

The trial court did not err in finding that defendant acted with a high degree of callousness. (Cal. Rules of Court, rule 4.421(a)(1).) Using the majority's definition of callousness, there is substantial evidence to support a finding that defendant acted "without regard for the feelings or welfare of another." The victim was on his own property and unarmed when killed by defendant. Three of the victim's daughters were at home at the time their father was killed. Defendant fired toward the victim's property, placing in danger the three daughters, or any neighbor or passerby, who could have been struck by an errant shot. These circumstances constitute substantial evidence that defendant acted without regard for the feelings or welfare of another.

This same evidence also supports a separate aggravating circumstance under California Rules of Court, rule 4.421(b)(1) that defendant represents a serious danger to society. The killing was entirely avoidable. Defendant could have remained safely inside his residence until law enforcement arrived. Violent conduct of this nature indicates defendant is a serious danger to society.

A third aggravating factor is found in the devastation to the victim's family resulting from defendant's unlawful killing of the victim. The avoidable killing of an unarmed man resulted in the destruction of a family. Children and grandchildren lost the patriarch of the family. Younger siblings were separated after the killing and the

responsibility for their upbringing was cast upon older siblings. The purpose for consideration of victim impact evidence is to allow the trial court to take into consideration the specific impact of a defendant's crime. The trial court's comments in the initial portion of the sentencing hearing demonstrate the court's appreciation that the effect on the victim's family is *why this homicide* is an aggravated offense.

Without citation of authority, the majority finds fault with the trial court's purported failure to sentence "on the understanding that defendant actually believed in the need for self-defense." I disagree that the court's approach was improper in this respect, and to the contrary, the court acted consistent with California Supreme Court authority. Our Supreme Court has sanctioned the trial court forming its own opinion on the evidence, even if it differs from the findings of the jury, because of the different burdens of proof imposed on the jury as to guilt and the trial court as to sentencing. "Nothing in the applicable statute or rules suggests that a trial court must ignore evidence related to the offense of which the defendant was convicted, merely because that evidence did not convince a jury that the defendant was guilty beyond a reasonable doubt of related offenses." (*People v. Towne* (2008) 44 Cal.4th 63, 85-86; see also *People v. Castorena* (1996) 51 Cal.App.4th 558, 562-563 [at sentencing the trial court was entitled to consider defendant's conduct as the equivalent of second degree murder, even though the conviction was for gross vehicular manslaughter while intoxicated].)

Given that there are three aggravating factors supported by substantial evidence, "there is no reasonable probability that a more favorable sentence would have been imposed in the absence of the error. As stated, a single factor in aggravation suffices to support an upper term. [Citation.] The court therefore could still have relied on the aggravating factors it listed to impose such a term. [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 729-730; see also *People v. Price* (1991) 1 Cal.4th 324, 492 [harmless error where trial court considered both proper and improper reasons for a sentence choice].) I would not put the victim's family through the anguish of a new

2

sentencing hearing where there is no reasonable probability of defendant obtaining a more favorable sentence.


KRIEGLER, J.

3